STATE OF NORTH CAROLINA v. ROGER LEE McQUEEN

No. 92

(Filed 6 June 1978)

1. **Criminal Law § 91— prisoner in another state—request for trial—failure to comply with Interstate Agreement on Detainers**

    The trial court properly denied defendant's motion to dismiss murder indictments pending against him in Cumberland County in 1977 on the ground that the State failed to comply with the Interstate Agreement on Detainers Act, G.S. 15A-761 *et seq.*, where defendant testified that, while a prisoner in Missouri, he wrote and mailed a letter in 1972 to the Clerk of Superior Court of Cumberland County requesting disposition of the murder charges; the evidence for the State strongly suggested that no such letter was received by the Clerk or in his office; and there was no showing by defendant that he gave the required notice and request to the warden of the Missouri State Prison or that the warden of that prison forwarded the required certificate to the District Attorney of Cumberland County or to the Superior Court of Cumberland County "by registered or certified mail, return receipt requested," or otherwise.

2. **Constitutional Law § 53— five-year delay between crimes and trial—defendant serving life sentence in another state—speedy trial**

    Defendant was not denied his Sixth Amendment right to a speedy trial by a delay of more than five years between two murders and defendant's trial in Cumberland County on those charges where, at the time of the murders, defendant was an escapee from a Missouri prison to which he had been sentenced to imprisonment for life; defendant fled from this State immediately after the murders; some two months later, defendant was arrested on an assault charge in Pennsylvania, was convicted, and was returned to Missouri to serve his life sentence; Cumberland County authorities promptly filed detainers against defendant in both Pennsylvania and Missouri; an Arkansas detainer on a murder charge had priority over the North Carolina detainer; when the Arkansas detainer was dropped in 1975 or 1976, Cumberland County authorities promptly sought temporary custody of defendant for trial and were prevented from trying him before 1977 by litigation instituted by defendant in the courts of Missouri; defendant's right to employment and social standing were not adversely affected by the delay since he was serving a life sentence in Missouri; the North Carolina detainer did not adversely affect his rights and privileges as an inmate in Missouri in view of the detainer filed by Arkansas; and defendant has shown no prejudice to his ability to call witnesses in his defense by virtue of the delay.

3. **Criminal Law § 87; Witnesses § 7— memory of witness refreshed by hypnosis—competency of testimony**

    In this prosecution for first degree murder, a witness's testimony as to her present recollection of events which she saw and heard at the time of the murders was not rendered incompetent by the fact that her memory had

State v. McQueen

been refreshed by hypnosis, the credibility of such testimony, in view of prior uncertainty on the part of the witness, being a matter for the jury's consideration.

**4. Homicide § 20.1— pictures of victims' bodies**

Pictures of the bodies of two murder victims were properly admitted to illustrate the testimony of a witness.

**5. Criminal Law § 34— evidence of other crimes**

In the presentation of its case in chief the State may not offer evidence of the defendant's past criminal activities, unrelated to the offense for which he is on trial, if the only bearing of such evidence upon the issue before the jury is that it discloses his bad character and tendency to commit such offenses as that with which he is presently charged.

**6. Criminal Law § 34.7— statements by defendant—other crimes—competency to show element of crime, intent to kill**

In a prosecution for two murders committed during the perpetration of armed robbery, a witness's testimony concerning statements by defendant immediately prior to and at the time of the events with which he is charged that he was an escapee from the Missouri State Prison where he was serving a life sentence for murder and that he had killed several people on different occasions was competent to show that defendant took articles from the victims by putting them in fear of their lives, an element of the offense of armed robbery and of murder committed in the perpetration of such robbery, and to establish the mental state of defendant and his intent to kill.

**7. Criminal Law § 86.5— cross-examination of defendant—crime for which defendant not convicted**

The district attorney was properly permitted to ask defendant on cross-examination whether he remembered shooting a named girl in the head in Arkansas where there was no showing that the district attorney's questions were asked in bad faith.

**8. Criminal Law § 97.2— refusal to permit defendant to reopen case**

The trial court in a murder case did not abuse its discretion in denying the motion of defendant to recall the jury to the courtroom after it had begun its deliberations and to reopen the case in order to permit defendant to introduce in evidence certain letters written by a State's witness to defendant after the murders for the purpose of showing that the witness was not afraid of defendant.

APPEAL by defendant from *Clark, J.*, at the 26 September 1977 Criminal Session of CUMBERLAND.

Upon indictments, proper in form, the defendant was found guilty of the murder in the first degree of Wilma Grace Norris and of the murder in the first degree of Linda Louise Lingle. Upon each of these charges, he was sentenced to imprisonment

for life. He was also indicted for and found guilty of armed robbery. Judgment upon that charge was arrested, the robbery being an element in the charges of first degree murder.

Evidence for the State, summarized, tended to show:

Wilma Norris was the operator of a house of prostitution. Linda Lingle was one of her employees. In the late evening of 24 June 1972, the bodies of the two women were found lying on their stomachs upon a bed in the house. Both had been dead for a number of hours. A coiled rope lay on the bed. Each body lay in an unnatural position, indicating that the hands had been bound behind the back at the time of death and then released. The cause of death, in each instance, was a bullet wound in the back of the head. Wilma Norris' body also bore a bullet wound in the left chest and another, nonfatal wound in the head. Linda Lingle's body also bore a second bullet wound in the head.

The house was in unusual disorder. A strongbox, found in the closet of this bedroom, contained no money. A pocketbook lay opened on the bed, its contents being strewn about. A key to Room 265 at a Fayetteville motel was found in the house. The defendant, using the name of C. M. Hignight, was registered as the occupant of this room, having checked out on 23 June.

Wilma Norris habitually kept money in the strongbox and also had a number of pieces of jewelry containing diamonds. On 23 June, she had in the house a number of guns, including a .25 automatic beside her bedstand, a .32 automatic on the bedstand, a rifle and a pellet gun in a cedar closet in the hall. That afternoon, Linda Lingle had approximately $700 to $800 in her possession.

Five young boys were digging potatoes in a field near the Norris house in the late afternoon of 23 June. They observed a Pinto automobile, described by them, variously, as beige, gold or white, drive up to the side door of the Norris house. A white man got out of the car and went into the house. (The defendant is white.) He remained in the house about half an hour. One of the boys testified that a photograph of the defendant's car resembled this automobile, except that the car in the photograph had upon it a stripe which the one he had so seen at the Norris house did not have. Another of the boys testified that he heard a scream from the house and then heard three or four gunshots, following which

he saw a woman come out "real fast," put a suitcase in the car and go back into the house. The boys, being frightened, did not go to the house. They observed no other car come to the house until they stopped work about dark.

The State's principal witness, Barbara Kiser, testified to the following effect:

In 1972, she and her friend, Christine Stanton, went from Chicago to Bennettsville, South Carolina, to work as prostitutes in a house managed by the defendant, whom she then knew as Roger Hignight. The defendant and Christine Stanton were married shortly thereafter. The photograph of the Pinto automobile, above mentioned, is a photograph of the car owned by Christine Stanton Hignight McQueen, the stripe, above mentioned, being a "peel on" stripe. On 6 June 1972, the defendant brought the two women to North Carolina and Barbara Kiser began working at Wilma Norris' house and Christine Stanton Hignight McQueen began working at a similar establishment operated by Wiley Carrico near Pinehurst.

On 23 June, Barbara Kiser received a telephone call from the defendant who informed her that Christine had been arrested in Bennettsville on a charge of burglary and the defendant needed $1,000 for a bond to get her out of jail. The defendant came to the Norris house that afternoon. He was "yelling" and told Barbara Kiser to pack her clothes for she had to go to Bennettsville to get Christine out of jail. When she refused to go, he struck her. Thereupon, Wilma Norris came into the room and the defendant "smacked" her. Wilma Norris then went to telephone the sheriff and the defendant followed her down the hall. Barbara Kiser then heard a gunshot. She ran into Wilma Norris' room, finding her lying on the bed and the defendant with a "silver revolver" in his possession.

The defendant then began screaming at Barbara Kiser and Linda Lingle, saying that he was wanted by the F.B.I. for escaping from a Missouri prison, where he had been serving a life sentence for murder, that his real name was Roger McQueen and that he had killed several people on different occasions. The defendant was acting "like a madman." He yelled at Linda Lingle to get and bring to him all the money and jewelry. He told Barbara Kiser that if she did not do as he directed, he would shoot

her infant daughter who was in Bennettsville. He directed Barbara Kiser to pack her clothes so she started throwing them in her suitcase.

At that point, Wilma Norris sat up on the bed and the defendant told her he wanted any money, guns, jewelry, anything of value that she might have in the house. Wilma Norris did not tell him where any such items were but reached across the bed to the nightstand. The defendant ordered her to stop and directed Barbara Kiser to open the drawer of the nightstand to see what she was trying to get. Barbara Kiser did so and found a pistol, State's Exhibit No. 14, which she handed to the defendant. State's Exhibit No. 15 she identified as a pellet gun taken from the cedar chest in the hallway of the Norris house. Meanwhile, Linda Lingle had brought various articles of jewelry to the defendant and was trying to find the keys to the strongbox kept in Wilma Norris' closet. In that box there was then between $800 and $1,000, which Barbara Kiser observed the defendant counting later. Barbara Kiser put her clothes in a suitcase which she took out to the car and then went back into the house. The defendant was still yelling at the three women who were terrified and trying to do whatever he said. Among other things, he told them: "I'm not playing with you girls. I kill people."

The defendant then directed Linda Lingle, "Get the rope," saying that he would just tie them up and he and Barbara Kiser would go. He laid the two women on the bed with their hands behind their backs, stood over them and shot them in the head, firing four times. He was then "very, very calm." At the defendant's direction, Barbara Kiser got in the car with him and they left. At his direction, she threw the gun out of the car window after he had wiped it with a towel. They then drove to Wiley Carrico's place where he tried to sell the jewelry to Carrico.

Thereafter, the defendant and Barbara Kiser drove to Roanoke, Virginia, and telegraphed to Christine, in care of the jail in Bennettsville, $1,000 for her bond. The defendant told Barbara Kiser he was afraid to go to Bennettsville lest the police there fingerprint him and discover that he was wanted for escape from prison. From Roanoke they drove to the defendant's brother's home in Wolcott, Connecticut, and from there traveled about over the entire country, including Chicago, Utah, Nevada, Little Rock,

Dallas, and Knoxville. State's Exhibit No. 17 was identified by Barbara Kiser as a pistol which the defendant had with him during these travels.

In Logansport, Indiana, they met a friend who handed them a police "flier" bearing their pictures and a picture of the car. Thereupon, they separated and Barbara Kiser returned to her home and surrendered herself to the F.B.I. A few days thereafter, the Federal charges against her were dropped. She was released and came to North Carolina where she made a statement to the Cumberland County police with the understanding that she would not be prosecuted. She further testified:

> "During the five years from June 23, 1972 until September, 1977, I was having difficulty with one question in my mind; sometimes I knew I saw him kill them and sometimes I really knew I hadn't seen him; I just know, I couldn't remember. I read an article in a newspaper and as a result of that I made a request of Major Washburn [of the Cumberland County Sheriff's Department] before I came back to Fayetteville to have me hypnotized when I got here. I met a Mr. Joe Raynor after I got down here and he put me under hypnosis. When I was under hypnosis I was able to actually go back to that day five years ago and just relive the whole morning and see the whole day like it was right now, everything was fresh. I remember now that I saw those women being shot by Roger McQueen. One of the reasons I tried to block it out of my mind was I blamed myself for those girls getting killed because I believed if I had packed my clothes when he told me to he wouldn't have killed them."

[Statements by counsel to the court, in the absence of the jury, indicate that Barbara Kiser was placed under hypnosis, at her request, when she came to North Carolina to assist the District Attorney in preparing the case for trial "a few weeks" prior to the trial. Defense counsel were given a tape of the hypnosis procedure the day before she testified. This tape was not offered in evidence. Barbara Kiser was not cross-examined with reference to the hypnosis procedure. The hypnotist was not called as a witness either by the State or by the defendant. Nothing in the record indicates that he was not available. The record con-

tains no testimony as to the procedure followed by him or as to what, if anything, Barbara Kiser related while under hypnosis.]

Other evidence offered by the State is to the following effect:

Christine Stanton Hignight McQueen was arrested in Bennettsville, South Carolina, 22 June 1972 and remained in jail until 24 June, on which date she received a Western Union money order in the amount of $1,000 from some place in Virginia and, thereupon, was released on bond.

The bullets removed from the body of Wilma Norris were .32 Smith & Wesson bullets and were fired from the same weapon. The gun from which they were fired was not found. The bullets removed from the head of Linda Lingle were misplaced.

On 23 June 1972, at approximately 7:30 p.m., the defendant and Barbara Kiser drove to Wiley Carrico's house in a Pinto car. Barbara Kiser went into the cabin to change her clothing. The defendant made a telephone call and then produced a quantity of jewelry which he offered to sell to Carrico for $200, saying that he needed the money to raise bond for his wife who was in jail in Bennettsville, South Carolina. He told Carrico that the jewelry was "hot" and that he, himself, was wanted for armed robbery in the Fayetteville area.

In August 1972, Anthony Matassa, an officer of the Pennsylvania State Police, in consequence of a report received by him that a described truck had been involved in an attempt at armed robbery, stopped a truck, meeting that description, upon the Pennsylvania Turnpike. Observing the defendant, who had hitchhiked a ride, in the sleeper portion of the truck, Officer Matassa asked him to get out. As the defendant's feet reached the ground, he drew a gun and pointed it at the officer. Officer Matassa pushed the gun aside and it was fired. The officer subdued the defendant. State's Exhibit No. 14, above mentioned, was identified by Officer Matassa. He also identified State's Exhibit No. 17 as a pistol taken by him from the defendant's pants pocket. Officer Matassa also removed a watch from the defendant's wrist, a man's diamond cluster ring from his finger and, from the defendant's suitcase, an air pellet gun, a radio and a box of .32 caliber automatic ammunition. The watch, the ring and the pellet gun

were identified by George Hammond, a friend of Wilma Norris, as having been in Wilma Norris' house on 23 June 1972.

The defendant testified in his own behalf to the following effect:

He is 41 years old. He first went to jail at the age of 14 for stealing his uncle's car. While serving a sentence in the Missouri State Penitentiary for second degree murder, he escaped. Subsequently, this sentence was overturned on appeal.

On 4 or 5 June 1972, he went to Fayetteville for the first time and stayed at the Norris house. There he turned over to Wilma Norris a pistol which he was then carrying. He then registered at the Ambassador Motel in Fayetteville.

On 22 June, he went to the Public Health Center in Fayetteville where it was discovered that he had a venereal disease. He telephoned the Norris house and told Barbara Kiser he believed he had contracted the disease from her and asked her to meet him, promising to make an appointment for her so that she could be treated. He took her for this appointment on 23 June and from there back to the Norris house, she keeping the key to the room at the Ambassador Motel. He did not go into the Norris house, which he left about 11:30 a.m. He drove to Bennettsville, South Carolina, picking up two hitchhikers near Laurinburg and dropping them at the outskirts of Bennettsville. The name of one of these hitchhikers was "Roger."

Arriving at his home in Bennettsville, he found that his wife had gone to the office of Dr. Strauss for treatment, he having telephoned her from Fayetteville to advise her of his own infection. He then drove to Dr. Strauss' office and talked to him, discovering that he had missed his wife. On his way back to his house, he observed that his wife's car was stopped by police officers. Since he, himself, was an escaped prisoner, he did not stop but went to his house, packed some suitcases, got some money and left.

He telephoned Barbara Kiser at the Norris house and told her that his "cover had been blown." As the result of this conversation, they met in Laurinburg, she arriving with her luggage in "a big red car" driven by a man who put her luggage out and

drove on. Barbara Kiser had a suitcase, a makeup kit and a hand-kerchief full of jewelry. They drove to the Carrico house that afternoon. Barbara Kiser said that she had "some spots on her clothes" and went into the cabin to wash them off or change her clothing. While she was so engaged, he showed the jewelry to Wiley Carrico and tried to sell it to him so that he could make bail for his wife. Leaving the Carrico house, they went to Roanoke, Virginia, where they sent the bond money to his wife in Bennettsville.

The first time he discovered what had happened at the Norris house was on June 26. At that time, he told Barbara Kiser that they needed money since he had spent $1,000 plus the cost of the telegram transmitting it to Bennettsville and travel expense and was getting low on funds. She replied that he need not worry about money for they had plenty and showed him a large sum, saying she had killed Wilma Norris and gotten the money from her. He did not leave Barbara Kiser because he felt obligated to help her, she having previously helped him. They finally separated in August because he and his wife had made ar-rangements for him to turn himself in to the prison officials in Missouri, the police being after him. When arrested in Penn-sylvania, he was heading back to Missouri. His car had broken down and he had hitchhiked a ride on the truck which was stop-ped by Officer Matassa. When he stepped down from the truck, having pistol on him, he started to hand the pistol to the officer who became excited and grabbed it.

On cross-examination, the defendant testified that he had spent a year in confinement, beginning at age 14, for stealing his uncle's car. Thereafter, he pled guilty to obtaining a narcotic under a false name. From that charge he was released due to a commutation of his sentence in 1963. In 1963, he killed a man in self-defense in Missouri and was convicted by the Missouri courts in 1964, which conviction was subsequently overturned by the Missouri Court of Appeals. Following his arrest in Pennsylvania, he entered a plea of guilty (apparently on a charge of assaulting the officer) and received a suspended sentence which permitted him to go back to Missouri to finish serving his life sentence there (the sentence subsequently vacated by the Missouri Court of Appeals).

In response to questions by the District Attorney concerning his associations with a woman named Bendell Kelley, beginning in Dallas, Texas, in the course of his travels with Barbara Kiser, and culminating with his shooting Bendell Kelley in the head as she lay on the ground in Millard County, Arkansas, the defendant replied to each question, "No, sir." While the record is not clear on this point, it would appear that his answer was intended as a denial that these things occurred.

[There was no testimony at the trial concerning any incident involving the defendant and Bendell Kelley, but the record discloses that while the defendant was an inmate of the Missouri State Prison, following his arrest in Pennsylvania, a detainer for the defendant had been filed by the State of Arkansas on a charge of murder.]

The Public Defender, appointed to represent the defendant on the charge against him in Pennsylvania, testified that, at the time (1972), the defendant told him he did not commit the offenses with which he was charged in North Carolina, that Barbara Kiser could have committed these offenses but he, himself, was nowhere in the area at the time. The defendant entered a plea of guilty in Pennsylvania to the charge of assault on Officer Matassa with intent to kill, it being the desire of the defendant to get the Pennsylvania charges resolved so that he could "get back in prison in Missouri."

Robert Joseph Nelson, an employee of the Cumberland County Health Department, testified that he was so employed on 22 June 1972 and, on that afternoon, treated Roger McQueen, then using the name of Claude M. Hignight, for a venereal disease. The next morning, the defendant brought Barbara Kiser in for like treatment.

Vera Hignight, another woman friend of the defendant, testified that the defendant, accompanied by Barbara Kiser, came to her in Chicago on 29 June 1972, at which time he told her that Barbara Kiser was in trouble with the police and he was assisting her to get away from the area. Barbara Kiser told this witness that she had killed a woman by shooting her in the back of the head because the woman was about to turn the defendant in as an escapee. During the conversation, this witness became angry with the defendant and attempted to slap him, whereupon Barbara

Kiser threatened that if she did so, Barbara Kiser would blow her brains out "just like I did to them." At that time, both the defendant and Barbara Kiser were carrying guns.

Prior to trial, the defendant moved to dismiss for failure of the State to comply with the Interstate Agreement on Detainers and for denial of his right to a speedy trial. With reference to these matters, the record shows:

On 12 October 1972, while in the Missouri State Penitentiary, the defendant was advised that detainers had been filed against him by several states, including North Carolina. He told the Missouri prison official that he wanted to get final disposition of these charges. On 10 November 1972, he wrote a letter addressed to "The Superior Court Clerk of Cumberland County." This letter, in addition to denying that he had killed anyone in Cumberland County, stated:

"I have signed the Agreement of Detainers pact to go to your county for trial last month (October) but I would further like to serve notice on you that I want to be brought to trial before 180 days. Or in the alternate remove the detainer from me here in Missouri. I am serving a life sentence here."

The defendant never received a response to this letter. After the expiration of the 180 days, he was referred to Mr. Dale Irwin, Inmate Legal Aid in the Missouri Department of Corrections. On 26 February 1973, Mr. Irwin wrote the Clerk of the Superior Court of Cumberland County, stating that he represented the defendant who was then serving a life sentence in the Missouri State Penitentiary and that the existence of the North Carolina detainer "precludes Mr. McQueen from having certain privileges afforded other inmates." The Irwin letter also stated that, since the defendant was then serving a life sentence, it was highly unlikely that North Carolina would ever be able to obtain him for trial. Consequently, Mr. Irwin wished advice as to the feasibility of getting the detainer dropped.

On 6 March 1973, the then District Attorney of Cumberland County replied to the Irwin letter, stating that he was not interested in dropping the detainers and any further effort by Mr. Irwin toward that end would be wasted.

On 25 April 1973, Mr. Irwin wrote the defendant advising him that efforts to get the detainers dropped were unsuccessful and, in his opinion, any attempt "to enjoin Arkansas or North Carolina" from bringing the defendant to trial would be futile.

The Clerk of the Superior Court testified that he had no record of having received the defendant's alleged letter of 10 November 1972. He further testified that his records showed that a bill of indictment against the defendant was returned "a true bill" on 9 October 1972 and, on 1 March 1974, his office had received an application to file a motion to dismiss or quash and an affidavit in support thereof.

Mrs. Ann Hatch, originally an employee of the Clerk's office and thereafter secretary and administrative assistant to the District Attorney, testified that she was familiar with the charges against this defendant and had searched for his alleged letter of 10 November 1972 but had been unable to find any such document or any entry evidencing its receipt. She further testified that the original detainers were filed with the Pennsylvania authorities, in whose custody the defendant then was, and were transferred to Missouri when the defendant was sent back to that state.

In 1975, the certified copies of the warrants, sent along with the original request for detainer, were returned and a letter was received by the District Attorney from Mr. Harry Lauf, Records Officer of the Missouri State Penitentiary, stating that the original detainers against the defendant were being removed. Thereupon, on 1 April 1975, the District Attorney wrote Mr. Lauf, enclosing certified copies of the warrants and advising that the District Attorney desired a new detainer to be placed against the defendant on those charges, the District Attorney having no intention of removing the detainers.

Thereafter, a request for the temporary custody of the defendant was made and the authorities of the State of Missouri advised the District Attorney that the defendant could be picked up the latter part of September 1975. Arrangements so to pick him up were made and a plane was chartered and sent to Missouri for him. However, a restraining order, issued at the request of the defendant, was served on the Cumberland County officers in Missouri and they were compelled to return without him.

State v. McQueen

Ultimately, in June 1977, after appellate review in Missouri of the restraining order, the District Attorney was advised by the Missouri authorities that the defendant could be picked up and this was done.

The defendant filed a motion to dismiss the charges, which was denied in February 1974 by Judge Harry Canaday who found, due to misinformation, that there were no North Carolina detainers pending against the defendant.

The defendant signed a "speedy trial form" on 12 October 1975, having been advised by Mr. Lauf, the Missouri official above mentioned, that he must do so if he wanted a final disposition of the matter. The Cumberland County records do not show this form was ever received.

The defendant was brought back to North Carolina 29 June 1977 and was tried at the 26 September 1977 Criminal Session of the Superior Court of Cumberland County.

After the Supreme Court of Missouri ruled that North Carolina was entitled to bring the defendant back for trial, the defendant filed a petition for habeas corpus in the United States District Court for the Western District of Missouri, asserting that the North Carolina charges should be dismissed because of the denial of his right to a speedy trial. This proceeding was transferred to the United States Court for the Eastern District of North Carolina where it was dismissed, as premature, by the order of Judge Dupree "without prejudice to the petitioner's right to proceed anew should he be convicted on the said charges."

Upon the hearing of the defendant's pretrial motion to dismiss for denial of a speedy trial, it was stipulated that the files of the Clerk of the Superior Court of Cumberland County do not show any entry indicating the receipt of the defendant's alleged letter dated 10 November 1972.

At that hearing, Mrs. Hatch testified, as above shown, and further:

"The letter written by Mr. McQueen was never received by the District Attorney's Office; as I have thoroughly searched my files looking for it in the District Attorney's office as well as the files of the Clerk of the Superior Court.

* * * [A]fter his arrest, * * * he was being held in Pennsylvania with some sort of assault charges lodged against him. Also at that time, it was my understanding that there were murder charges lodged against him by the State of Arkansas. I was also informed that he was going back to Missouri to complete serving a life sentence he had been serving for murder in that State.

"I did not receive any correspondence from Roger McQueen requesting a disposition or a trial. I did receive an inquiry requesting that the detainers be dismissed from a Mr. Dale Irwin. I prepared a letter for Mr. Jack Thompson [then the District Attorney] at his direction stating that the detainers would not be dropped. That letter did not mention anything concerning a speedy trial nor have I received any communication from Roger McQueen requesting a speedy trial. I was later informed that the detainers against Mr. McQueen from the State of Arkansas had been dropped.

"Shortly after Mr. Grannis [the present District Attorney] took office in 1975, efforts were made to get temporary custody of Roger McQueen after determining his status. A request for temporary custody was made, under the provisions of the Interstate Agreement on Detainers Act. * * * Arrangements were then made to pick Roger McQueen up in October of 1975. Officers were sent to Missouri to get Roger McQueen but returned without him because a temporary restraining order was placed on him.

"I was continuously aware of the status of Mr. McQueen and in May, 1977, I was informed that Mr. McQueen would be available for temporary custody to North Carolina. We returned him to North Carolina on June 30, 1977.

"As a member of the District Attorney's Office since June 23, 1972, I have been familiar with the number of serious crimes processed through the office, a substantial number of those cases being homicides or other serious felony crimes. I had several conversations with Mr. Jack Thompson [the former District Attorney] concerning bringing Roger McQueen back to North Carolina. In talking about the detainers, we learned the detainer in Arkansas had priority. I never was clear about the charges in Pennsylvania. The de-

tainer against Roger McQueen from the State of Arkansas had priority while Roger was in Missouri. After January 1, 1975, I had numerous discussions with the new District Attorney, Mr. Ed Grannis, concerning the feasibility of bringing Roger McQueen back. I also had several phone conversations with the authorities in Missouri.

"* * * The detainers from Arkansas were dropped against Roger McQueen sometime in 1975 or 1976, I don't know the exact date."

The motion to dismiss for failure to prosecute and accord the defendant a speedy trial was denied.

*Rufus L. Edmisten, Attorney General, by Donald W. Grimes, Assistant Attorney General, for the State.*

*James R. Parish and Fred J. Williams for Defendant.*

LAKE, Justice.

[1] The defendant's first contention is that the court committed reversible error in the overruling of his motion to dismiss the indictments for the reason that the State failed to comply with the Interstate Agreement on Detainers Act. G.S. 15A-761 *et seq.* Article III of this Act provides:

"(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment * * * on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered *to the prosecuting officer* and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment * * *. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole

eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

"(b) The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden * * * having custody of him, who shall promptly forward it together with the certificate to the *appropriate prosecuting official* and court by registered or certified mail, return receipt requested.

\* \* \*

"(d) Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall operate as a request for final disposition of all untried indictments * * * on the basis of which detainers have been lodged against the prisoner from the state to whose *prosecuting official* the request for final disposition is specifically directed. * * *

"(e) Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall also be deemed to be a waiver of extradiction with respect to any charge or proceeding contemplated thereby * * * The request for final disposition shall also constitute a consent by the prisoner to the production of his body in any court where his presence may be required in order to effectuate the purposes of this agreement and a further consent voluntarily to be returned to the original place of imprisonment in accordance with the provisions of this agreement. * * *" (Emphasis added.)

Article IV of the Act then provides a procedure whereby the appropriate officer of the jurisdiction in which the indictment is pending may obtain temporary custody of the prisoner for trial. Article V of the Act provides in paragraph (c):

"(c) If the appropriate authority shall refuse or fail to accept temporary custody of said person, or in the event that an action on the indictment * * * is not brought to trial within the period provided in Article III or Article IV hereof, the appropriate court of the jurisdiction where the indictment * * * has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect."

The record before us does not show compliance by the defendant with the procedures so outlined in the above quoted provisions of this Act. There is no showing by the defendant that he gave the specified notice and request to the warden of the Missouri State Prison or that the warden of that prison forwarded to the District Attorney of Cumberland County or to the Superior Court of Cumberland County "by registered or certified mail, return receipt requested," or otherwise, the specified certificate. All that the record before us shows is that when the detainers filed came to the attention of the prison officials of Missouri, they were brought by those officials to the attention of the defendant and, the defendant, himself, wrote a letter on 10 November 1972, which, he says, he mailed to the Clerk of the Superior Court of Cumberland County.

The defendant does not contend that he mailed to the District Attorney any such request for final disposition of the indictment. The evidence for the State strongly suggests that, if such request was in fact mailed to the Clerk of the Superior Court of Cumberland County, it was never received by the Clerk or in his office. In response to an inquiry subsequently directed to the Clerk of the Superior Court by a member of the Missouri Student Legal Aid Program concerning the possible dropping of the detainer, the then District Attorney promptly replied, "This office would not in any way be interested in dropping the detainers against Roger Lee McQueen."

The record indicates no further communication whatever from the defendant, or on his behalf, until 26 March 1975, when the Records Officer of the Missouri State Penitentiary wrote to the Sheriff of Cumberland County returning the warrants which had been filed with the original request for detainer. The then District Attorney promptly replied requesting the placing of a new detainer and enclosing certified copies of the warrants which had been issued against the defendant for the offenses here involved.

When the Cumberland County authorities requested temporary custody of the defendant from Missouri in September 1975, and dispatched officers to Missouri to bring him to North Carolina for trial, the defendant blocked that effort by obtaining from a Missouri court a restraining order. The record before us

indicates that this litigation in the courts of Missouri, including appellate procedures related thereto, continued until the Cumberland County authorities were finally notified in June 1977 that they could pick up the defendant for trial. This they did promptly and he was tried and convicted at the 26 September 1977 Session of the Superior Court of Cumberland County.

Thus, the record before us indicates no violation by the Cumberland County authorities of the Interstate Agreement on Detainers Act. Consequently, there was no error in the entry of the order denying the motion of the defendant to dismiss the indictments on account of such alleged violation. *State v. White*, 270 N.C. 78, 153 S.E. 2d 774 (1967).

[2] The defendant's next contention is that he has been denied his Sixth Amendment right to a speedy trial. The record before us shows that, at the time of the two murders in North Carolina, of which the defendant stands convicted, he was an escapee from the Missouri State Penitentiary to which he had been sentenced to imprisonment for life upon his conviction in that state for murder in the second degree. Immediately after the murders in this State, of which he stands convicted, the defendant and his companion fled from North Carolina and roamed at large throughout the United States until he was finally arrested in Pennsylvania on the charge of assault upon an officer of that state with intent to kill. The Cumberland County authorities promptly forwarded the appropriate papers for a detainer against the defendant to the Pennsylvania authorities. However, the defendant was returned to Missouri by Pennsylvania for the completion of the service of his Missouri sentence.

The record further shows that the State of Arkansas had previously filed with the Missouri or the Pennsylvania authorities its own request for a detainer of the defendant, which request the Missouri authorities gave priority over the North Carolina detainer. The first communication shown by the record before us to have been received by any of the Cumberland County authorities from Missouri, concerning the North Carolina detainer lodged against this defendant, was the letter from the defendant's Inmate Legal Aid, a member of the staff of the Missouri Department of Corrections. This letter stated, "[S]ince he [the defendant] is serving a life sentence, it is highly unlikely that the State of North Carolina will ever be able to obtain him for trial."

The Cumberland County authorities continued to insist upon the maintenance of the detainers filed by them with the Missouri authorities and, as soon as they were notified by the Missouri authorities that they could pick up the defendant, they endeavored to do so but were thwarted by court action instituted by him in Missouri.

We find in this record no evidence of wilful neglect or of abandonment of the cases against this defendant by the Cumberland County authorities.

The record before us shows that the Arkansas detainer, which the Missouri authorities gave priority over the North Carolina detainer, was based upon a charge of murder in that state. Although it is not clearly so shown in the record before us, this Arkansas charge, apparently, was based upon an alleged shooting in the head of a woman named Bendell Kelley, referred to in the above statement of facts. The Arkansas detainers appear to have been dropped in 1975 or 1976, for reasons not set forth in the record before us. When so advised by the Missouri prison authorities, the record before us indicates that the Cumberland County authorities promptly sought temporary custody of the defendant for trial and were prevented from trying him earlier by litigation instituted by the defendant in the courts of Missouri.

We find no error in the denial of the defendant's motion to dismiss the indictments against him for failure to accord him a speedy trial thereon.

The right to a speedy trial upon a criminal charge, guaranteed by the Sixth Amendment to the Constitution of the United States, is made applicable to the states by the Fourteenth Amendment. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed. 2d 101 (1972); *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed. 2d 1 (1967). Long before those decisions it was established as part of the fundamental law of this State. *State v. Patton*, 260 N.C. 359, 132 S.E. 2d 891 (1963). The criteria for determining whether such right has been denied are set forth by the Supreme Court of the United States in *Barker v. Wingo, supra.* There, the Court said:

"We think the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of

the factors to be considered in an inquiry into the depriva-
tion of the right. * * * The approach we accept is a balancing
test, in which the conduct of both the prosecution and the
defendant are weighed.

"A balancing test necessarily compels courts to approach
speedy trial cases on an ad hoc basis. We can do little more
than identify some of the factors which courts should assess
in determining whether a particular defendant has been
deprived of his right. Though some might express them in
different ways, we identify four such factors: Length of
delay, the reason for the delay, the defendant's assertion of
his right, and prejudice to the defendant.

*    *    *

"We regard none of the four factors identified above as
either a necessary or sufficient condition to the finding of a
deprivation of the right of speedy trial. Rather, they are
related factors and must be considered together with such
other circumstances as may be relevant. In sum, these fac-
tors have no talismanic qualities; courts must still engage in
a difficult and sensitive balancing process." 407 U.S. at 528,
530, 533.

In *State v. McKoy*, 294 N.C. 134, 240 S.E. 2d 383 (1978), we
recently applied these criteria and ordered dismissal of charges
for denial of the defendant's right to a speedy trial. Speaking
through Justice Huskins, we there said:

"The right of every person formally accused of crime to
a speedy and impartial trial is secured by the fundamental
law of this State, *State v. Hollars*, 266 N.C. 45, 145 S.E. 2d
309 (1965), and guaranteed by the Sixth Amendment to the
federal constitution, made applicable to the State by the
Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S.
213, 18 L.Ed. 2d 1, 87 S.Ct. 988 (1967). Prisoners confined for
unrelated crimes are entitled to the benefits of this constitu-
tional guaranty. *State v. Johnson*, 275 N.C. 264, 167 S.E. 2d
274 (1969).

*    *    *

"[T]he circumstances of each particular case must determine whether a speedy trial has been afforded or denied, and the burden is on an accused who asserts denial of a speedy trial to show that the delay was due to the neglect or wilfulness of the prosecution. *State v. Johnson*, supra.

\* \* \*

"Barring circumstances which justify delay, a defendant desiring a speedy trial is constitutionally entitled to it within a reasonable time. Where, as here, defendant carries the burden of proof by offering evidence which tends to show *prima facie* that the delay is due to the wilful neglect of the prosecution, the State should offer evidence fully explaining the reasons for the delay and sufficient to rebut the *prima facie* showing or risk dismissal. The record before us contains *no evidence* designed to explain or justify the ten month delay from 2 June 1975 to 12 April 1976. Such indifference to the dictates of the law leaves appellate courts with few options." 294 N.C. at 140, 141, 143; 240 S.E. 2d at 387, 388, 390.

In *State v. Spencer*, 281 N.C. 121, 124, 187 S.E. 2d 779, 781 (1972), speaking through Justice Branch, we said:

"The constitutional right to a speedy trial protects an accused from extended imprisonment before trial, from public suspicion generated by an untried accusation, and from loss of witnesses and other means of proving his innocence resulting from passage of time. Whether defendant has been denied the right to a speedy trial is a matter to be determined by the trial judge in light of the circumstances of each case. The accused has the burden of showing that the delay was due to the State's wilfulness or neglect."

In the present case, a bit more than five years elapsed between the alleged offenses and the trial of the defendant therefor. Nothing else appearing, this would be an unreasonable delay. However, nothing in the record indicates that this was a purposeful delay by the State, in order to prejudice or harass the defendant. For the first two months the defendant was an armed fugitive, moving secretly from state to state throughout the country. While it is true that for approximately five years preceding his trial on these charges he was kept in prison, that imprison-

ment had no relation to the present charges and was in the prison of another state pursuant to his prior conviction in the courts of that state. Thus, no action which the authorities of Cumberland County could have taken with reference to the present matter could have terminated that imprisonment. It is not the type of pretrial imprisonment to which the decisions on the subject of speedy trial refer. In view of the detainers filed against him by the State of Arkansas, we find nothing in the record which indicates that the detainers filed by the Cumberland County authorities, in connection with the present charges, adversely affected his rights or privileges as an inmate of the Missouri State Penitentiary. Since he was so confined, and his confinement in Missouri would have continued irrespective of any action which the Cumberland County authorities might have taken to bring him to trial, it cannot be found that his right to employment, or his social standing in the community, was adversely affected by the delay in bringing him to trial on these charges.

The only possible prejudice to the defendant by reason of the delay in the prosecution of these cases, appearing upon this record, would be a loss of witnesses favorable to his defense of alibi. An analysis of the record shows no such prejudice. The defendant, himself, testified that he left the Norris house at about 11:30 a.m. on the day the two murders occurred. The evidence for the State was that the murders occurred after 3:30 p.m., at which time the State's witness, James Edward Pleasant, testified that he was at the Norris house attempting to sell an automobile to Wilma Norris and she and two other women were then in the house.

The defendant's testimony, designed to establish his alibi, was that he, observing the arrest of his wife on the streets of Bennettsville, South Carolina, immediately telephoned Barbara Kiser and, as a result of that conversation, he drove to Laurinburg to wait for her, arriving at approximately 2:15 p.m. Laurinburg is but 42 miles from Fayetteville, near which the Norris house was located. Thus, by his own testimony, the defendant, after his interview with Dr. Strauss in Bennettsville, had ample time to reach the Norris house near Fayetteville before the murders were committed therein. The distance from Fayetteville to Bennettsville is 74 miles. The defendant's testimony is clearly to the effect that he tarried only briefly in the office of Dr.

Strauss in Bennettsville and, immediately thereafter, fled from that city. It would be an easy matter for him to have traveled from Fayetteville to Bennettsville and return between 11:30 a.m. and the time the two women were murdered in the Norris house.

The defendant testified that, en route to Bennettsville, he picked up two hitchhikers near Laurinburg and let them out on the outskirts of Bennettsville. One of these hitchhikers was "Roger," it not appearing what his last name or his address, or his hitchhiking destination, was. The Cumberland County authorities did not know the whereabouts of the defendant for at least two months after the killings were discovered. Had he been placed on trial immediately after his arrest, which, of course, was impossible, it is utterly unrealistic to suppose that he could have then located this alleged hitchhiker. Thus the delay in bringing him to trial has not deprived him of this witness.

According to the defendant's testimony, it was his wife, not the defendant himself, who was the patient of Dr. Strauss on 23 June 1972. Conceivably, Dr. Strauss might have remembered for a reasonable time, or even have made some record of his conversation with the defendant in the doctor's office. Dr. Strauss was not called as a witness at the defendant's trial. In oral argument in this Court, we were informed that Dr. Strauss is now deceased. Nothing in the record so indicates. Assuming, as we do, that Dr. Strauss died prior to the trial of the defendant on these charges and after the Cumberland County authorities learned of the defendant's whereabouts, the defendant has not been prejudiced by the unavailability of Dr. Strauss as a witness to corroborate his alleged alibi. The reason for this conclusion is that the record clearly shows, through the testimony of police officers of the City of Bennettsville, that the defendant's wife was not arrested on 23 June, the date of the murders in question, but about noon on 22 June and she remained in jail until 24 June when she received the $1,000 telegraphed to her by the defendant and Barbara Kiser and used this to post bond and obtain her release. Thus, the defendant could not have visited Dr. Strauss' office immediately after his wife's departure therefrom on the afternoon the murders here involved were committed. Consequently, the defendant has shown no prejudice whatever to his ability to call witnesses in his defense by virtue of the delay in the trial of these charges.

It follows that the defendant has, in no way, been prejudiced in the trial of this matter by reason of the delay of such trial and his constitutional right to a speedy trial has not been violated.

[3]   We turn next to the defendant's contention that it was error to admit the testimony of Barbara Kiser for the reason that it was the result of her hypnosis prior to trial. In this contention, we find no merit. The circumstance that this witness was hypnotized prior to trial would bear upon the credibility of her testimony concerning the occurrences at the Norris house at the time the two women were killed, but would not render her testimony incompetent. As above shown, the jury was fully advised that the witness had been so hypnotized. Her credibility, as a result of this circumstance, and of other matters bearing thereon, was for the jury. 1 Stansbury, North Carolina Evidence, § 8 (Brandis Rev. 1973); Strong, N.C. Index 3d, Trial, § 18 (1978). Since the charge of the court is not included in the record before us and there is no exception thereto by the defendant, it is presumed that the court correctly instructed the jury on this matter.

It is to be observed that nothing in the record indicates that this witness was under hypnosis at the time of her testimony in court; it is also to be observed that we do not have before us any question as to the admissibility of any pretrial statement by this witness while under hypnosis. We express herein no opinion as to the admissibility of such a statement.

The witness testified that, following the events in question, she endeavored to blot them from her memory and her recollection of them because uncertain but, thereafter, prior to the trial, she was hypnotized, at her request, and, as a result, as of the time of her testimony, she clearly remembered what she had seen and heard at the time of the events to which her testimony relates. According to her testimony, her memory of these events was refreshed by the hypnotic procedure which she underwent some time prior to the trial. The fact that the memory of a witness concerning events, distant in time, has been refreshed, prior to trial, as by the reading of documents or by conversation with another, does not render the witness incompetent to testify concerning his or her present recollection. The credibility of such testimony, in view of prior uncertainty on the part of the witness, is a matter for the jury's consideration. So it is when the witness

has, in the meantime, undergone some psychiatric or other medical treatment by which memory is said to have been refreshed or restored. So it is when the intervening experience has been hypnosis.

In the present case, the defendant did not seek to cross-examine Barbara Kiser concerning the hypnosis procedure or to call the hypnotist, who appears to have been available, for examination concerning the procedures used by him, so as to determine the reliability of the refreshed recollection. We need not consider whether the immunity from prosecution granted to this witness had more to do with refreshing her recollection than did the hypnosis. The defendant does not attack either the admissibility or the credibility of her testimony on that account.

The record discloses that, prior to trial, the defendant's counsel had access to a tape recording of the entire hypnosis procedure. The silence of the record concerning this procedure permits the inference that nothing thereon indicated the planting by the hypnotist into the mind of the witness of any suggestion as to what occurred in the Norris house at the time the two women were murdered, or as to what the testimony of the witness at the trial would be.

The testimony of the witness was, "I remember *now* that I saw those women being shot by Roger McQueen." (Emphasis added.) Evidently, the jury believed this testimony. Corroborating circumstances developed through the testimony of other witnesses include the obvious falsity of the defendant's purported alibi testimony, the testimony of the young boys working in the nearby potato field, the defendant's possession immediately after the murders of jewelry and weapons taken from the scene, his attempt only an hour or two thereafter to sell the jewelry and his motive for robbery in order to post bond for his wife.

In *Kline v. Ford Motor Co., Inc.*, 523 F. 2d 1067, 1069-1070 (9th Cir., 1975), in holding testimony following hypnosis to be competent, the Court said:

"She [the witness] was present and personally saw and heard the occurrences at the time of the accident. She was testifying about her present recollection of events that she had witnessed. That her present memory depends upon

refreshment claimed to have been induced under hypnosis goes to the credibility of her testimony not to her competence as a witness. Although the device, by which recollection was refreshed is unusual, in legal effect her situation is not different from that of a witness who claims that his recollection of an event that he could not earlier remember was revived when he thereafter read a particular document."

In *Wyller v. Fairchild Hiller Corp.*, 503 F. 2d 506, 509 (9th Cir., 1974), the Court said:

"We cannot accept Fairchild's argument that Wyller's testimony was rendered inherently untrustworthy by his having undergone hypnosis. Wyller testified from his present recollection, refreshed by the treatments. His credibility and the weight to be given such testimony were for the jury to determine. Fairchild was entitled to, and did, challenge the reliability of both the remembered facts and the hypnosis procedure itself by extensive and thorough cross-examination of Wyller and the hypnotist."

In *State v. Jorgensen*, 8 Or. App. 1, 9, 492 P. 2d 312, 315 (1971), the Court said:

"Since both of these witnesses gave their testimony concerning the issues of the case in open court and were subjected to prolonged and rigorous cross-examination by defendant's counsel before the jury, we do not believe that the fact they had been subjected to certain psychiatric and medical examinations and procedures prior to testifying, which were fully exposed in the evidence, would be a basis for disallowing their testimony."

To the same effect is *Harding v. State*, 5 Md. App. 230, 246 A. 2d 302 (1968). In this respect, we perceive no basis for a different rule in criminal actions from that which prevails in civil suits.

The defendant relies upon our decision in *State v. Foye*, 254 N.C. 704, 120 S.E. 2d 169 (1961), to the effect that it is error to admit in evidence in a criminal action the results of lie detector tests. *See also*, Annot., 23 A.L.R. 2d 1306 (1952), "Physiological or Psychological Truth and Deception Tests." That is an entirely different question from the one with which we are here confronted.

There, the purpose of the proposed evidence was to invade the province of the jury with evidence designed to show the credibility or lack of credibility of other testimony. This Court concluded that the accuracy of the results attained by the use of such scientific device had not been sufficiently established to justify its use for that purpose. Here, we are concerned with the admissibility of testimony which the witness says is her present recollection of events which she saw and heard, the credibility of her testimony being left for the jury's appraisal.

The defendant also relies upon cases such as *State v. Pierce*, 263 S.C. 23, 207 S.E. 2d 414 (1974), and *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E. 2d 414 (1974), which hold that testimony of a hypnotist as to what his subject stated while in a hypnotic trance is incompetent to prove the truth or falsity of such statement. These cases are, obviously, distinguishable from the question confronting us. Here, the testimony in question is not concerning extra-judicial statements made by a person under hypnosis. We are here concerned with the testimony of the witness as to what the witness presently remembers about events which the witness saw and heard.

In *State v. Peacock*, 236 N.C. 137, 139, 72 S.E. 2d 612, 615 (1952), this Court, approving the use of memoranda previously prepared by the witness for the purpose of refreshing his recollection while on the witness stand, quoted with approval *Jewett v. United States*, 15 F. 2d 955 (9th Cir., 1926), as follows:

> "It is quite immaterial by what means the memory is quickened; it may be a song, or a face, or a newspaper item, or a writing of some character. It is sufficient that by some mental operation, however, mysterious, the memory is stimulated to recall the event, for when so set in motion it functions quite independently of the actuating cause."

We, therefore, find no error in the ruling of the trial court permitting Barbara Kiser to testify concerning matters observed and heard by her at the time of the murders by reason of the fact that, in the meanwhile, she had been subjected to hypnosis.

There is, likewise, no merit in the defendant's contention that it was error to deny his motion for the sequestration of witnesses at the trial, this being a matter in the discretion of the trial court,

and there being no indication of abuse of discretion in the present instance. *State v. Felton*, 283 N.C. 368, 196 S.E. 2d 239 (1973); *State v. Cook*, 280 N.C. 642, 187 S.E. 2d 104 (1972); *State v. Yoes* and *Hale v. State*, 271 N.C. 616, 641, 157 S.E. 2d 386 (1967); 1 Stansbury, North Carolina Evidence, § 20 (Brandis Rev. 1973).

[4]   There is also no merit in the defendant's contention that there was error in the admission of pictures of the bodies of the deceased women. It is well established that pictures which aid the witness in illustrating his testimony, though gruesome, are admissible in evidence for the purpose of so aiding the witness. *State v. Dollar*, 292 N.C. 344, 355, 233 S.E. 2d 521 (1977); *State v. Spaulding*, 288 N.C. 397, 219 S.E. 2d 178 (1975), *death sentence vacated*, 428 U.S. 904 (1976); *State v. Atkinson*, 275 N.C. 283, 311, 167 S.E. 2d 241 (1969), *reversed as to death sentence only*, 403 U.S. 948 (1971); *State v. Gardner*, 228 N.C. 567, 46 S.E. 2d 824 (1948); 1 Stansbury, North Carolina Evidence, § 34 (Brandis Rev. 1973). The record does not indicate excessive use of photographs in the present case. This is, largely, a matter in the discretion of the trial judge. *State v. Dollar, supra.*

[5, 6]   It is well settled in this State that in the presentation of its case in chief the State may not offer evidence of the defendant's past criminal activities, unrelated to the offense for which he is on trial, if the only bearing of such evidence upon the issue before the jury is that it discloses his bad character and tendency to commit such offenses as that with which he is presently charged. *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954). Nevertheless, there was no error in the admission of the testimony of Barbara Kiser concerning statements by the defendant at the Norris house immediately prior to and at the time of the events with which he is charged, those statements being to the effect that he was an escapee from the Missouri State Prison where he was serving a life sentence for murder, that he was a killer and had killed several people on different occasions. This testimony was relevant to the charge of armed robbery and, therefore, to the charge of murder in the perpetration of such robbery. It was part of the *res gestae* and established the setting in which the other events at the Norris house, narrated by Barbara Kiser, occurred. It clearly tended to show that the defendant took from the possession of Wilma Norris and Linda Lingle articles of value by putting them in fear of their lives, an element of

the offense of armed robbery and of the offense of murder committed in the perpetration of such robbery. It was also relevant to establish the mental state of the defendant and his intent to kill. Thus, the admission of this evidence falls within exceptions to the general rule set forth in the McClain case itself.

In *State v. Stegmann*, 286 N.C. 638, 652, 213 S.E. 2d 262 (1975), death sentence vacated, 428 U.S. 902 (1976), speaking through Justice Huskins, we quoted with approval the following statement in Stansbury, North Carolina Evidence, § 91 (Brandis Rev. 1973):

"Evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; but if it tends to prove any other relevant fact it will not be excluded merely because it also shows him to have been guilty of an independent crime."

Other testimony by this witness concerning an offense committed by the defendant while the defendant and the witness were traveling together in Nevada, following the alleged murders, and a statement made by the defendant to her during their travels to the effect that he had killed several people was stricken by the court upon motion of the defendant. The jury was instructed not to consider such testimony. It is presumed that the jury complied with such instruction by the court. *State v. Moore*, 276 N.C. 142, 149, 171 S.E. 2d 453 (1970).

[7] Upon cross-examination of the defendant who had taken the stand in his own behalf, the District Attorney asked a series of questions concerning the defendant's actions with reference to Mrs. Bendell Kelley. The first question was, "Do you recall at that time a woman by the name of Bendell Kelley telling you about the problems she —?" Defendant's counsel objected "to this line of questioning." The objection was overruled. Obviously, that specific question was merely introductory. It was neither completed nor answered. There then followed fourteen questions with reference to the defendant's actions concerning Mrs. Kelley, each of which began, "Do you remember." No specific objections were interposed to these further questions. In each instance, the defendant answered, "No, sir." The ultimate question in this series was, "Do you remember * * * shooting her in the head?"

Again, the answer was, "No, sir." The State, being bound by the answer of the defendant, offered no evidence of such shooting. There is nothing, however, in the record to indicate that the question was not asked in good faith. On the contrary, the record with reference to the above mentioned pretrial motions shows that a detainer for the defendant was filed by the State of Arkansas for murder. The questions so propounded by the District Attorney to the defendant relate to the State of Arkansas.

It is clearly permissible for the State, in cross-examining a defendant charged with crime, to ask him about his own past criminal actions whether or not he has been convicted thereof. *State v. Gainey*, 280 N.C. 366, 373, 185 S.E. 2d 874 (1972). There being no showing that the questions directed to the defendant in this connection were asked in bad faith, there was no error in overruling the defendant's objection "to this line of questions."

[8] There was, likewise, no error in denying the motion of the defendant to recall the jury to the courtroom after it had begun its deliberations and to reopen the case in order to permit the defendant to introduce in evidence certain letters said to have been written by Barbara Kiser to the defendant, while they were temporarily apart, between the events at the Norris house and the defendant's arrest in Pennsylvania. The purpose of such evidence, according to the defendant, was to show that Barbara Kiser was not afraid of him. As the defendant's counsel concedes in his brief, this is a matter in the discretion of the trial court. *State v. Shutt*, 279 N.C. 689, 695, 185 S.E. 2d 206 (1971), cert. den., 406 U.S. 928 (1972); 4 Strong, N.C. Index 3d, Criminal Law, § 97 (1976). There was no abuse of discretion in the ruling of the court in the present instance.

Each other assignment of error by the defendant has been carefully considered and we find no merit therein. It would serve no useful purpose to discuss these in detail.

No error.