STATE OF NORTH CAROLINA v. HUGH LEE VAUGHN

No. 57

(Filed 29 December 1978)

1. Criminal Law § 21.1— no probable cause hearing—no grounds for dismissing indictment

The trial court did not err in denying defendant's motion to dismiss the indictment on the ground that no probable cause hearing was held prior to indictment.

2. Grand Jury § 3— composition of grand jury—method of disqualification of grand jurors

Defendant's contention that his indictment should be quashed on the ground that the grand jury which indicted him was improperly constituted due to improper procedures used in drawing up the final jury list from which members of the grand jury were selected is without merit, since defendant's evidence that the jury commission did not always make proper inquiry before disqualifying certain individuals but instead simply took the sheriff on his word that such persons were disqualified did not make out a prima facie case for defendant's claim that qualified jurors were unlawfully excluded from the list; there was no evidence that the sheriff was unlawuflly delegated the responsibility, and given the final say, of determining the jury list but instead that he simply assisted the commission with the recommendations regarding those persons he thought disqualified for service; and even if defendant had shown that certain qualified persons were improperly disqualified, dismissal of the indictment would not be required absent a showing of corrupt intent or systematic discrimination in the compilation of the list, or a showing of the presence upon the grand jury itself of a member not qualified to serve. The trial judge was not required to make findings of fact in denying defendant's motion to quash in the absence of evidence that any qualified person was excluded from jury service and in the absence of contradictory and conflicting evidence as to the material facts.

State v. Vaughn

**3. Criminal Law § 91; Constitutional Law § 55— motion for speedy trial—failure to show defendant proceeding under Detainer Act—trial within 180 days not required.**

Defendant's contention that the indictment against him should have been dismissed with prejudice pursuant to G.S. 15A-761, Articles III(a) and V(c), because the State failed to bring him to trial within 180 days after his motion for speedy trial is without merit since defendant's speedy trial motion did not comply with the provisions of G.S. 15A-761, Article III(a), and there was nothing in the motion to put the proper authorities on notice that defendant was proceeding under the provisions of the Detainer Act.

**4. Constitutional Law § 55; Criminal Law § 91— continuance to obtain witnesses—waiver of right to trial within 120 days**

By requesting a continuance for the purpose of procuring witnesses who were confined in prisons in S. C., defendant waived his right to be tried within 120 days under G.S. 15A-761, Article IV(c).

**5. Constitutional Law § 53— speedy trial—delay caused by defendant—no denial of speedy trial**

Defendant who was serving a life sentence in S. C. was not denied his right to a speedy trial where the length of the delay between indictment and trial was sixteen months; the delay from the time defendant was delivered to N. C. and the date of the trial was due solely to defendant's motion for continuance, based on his inability to obtain witnesses from S. C.; from the date of the indictment to the time defendant was delivered to N. C., defendant was imprisoned in S. C. and soon after defendant moved for a speedy trial, the State acted to have him brought to N. C.; because defendant's imprisonment in S. C. would have continued irrespective of any action which N. C. authorities might have taken to bring him to trial, his right to employment and his social standing in the community were not adversely affected by the delay; and the delay did not cause loss of witnesses favorable to defendant's defense.

**6. Criminal Law § 169.2— objection sustained—evidence stricken—defendant not entitled to new trial**

Where an SBI agent stated upon cross-examination by defense counsel that the place of defendant's imprisonment was a place "where chronic or incorrigible inmates are kept," and the trial court immediately, upon defendant's objection, struck such testimony from the jury's consideration, defendant was not entitled to a new trial, since defendant made no motion for a mistrial based on this matter; defendant opened the door for the testimony that was given; and defendant, when he took the stand, testified of his own volition to evidence of a similar nature.

**7. Criminal Law § 85.1— specific act of truthfulness—evidence inadmissible**

Defendant's contention that his testimony concerning his plea in a murder trial in S. C. was relevant to prove his capacity for truthfulness is without merit, since a party may not show specific acts of his good conduct or truthfulness as evidence of his good character or capacity for truthfulness.

State v. Vaughn

8. **Criminal Law § 102.5— defendant's eligibility for parole in another state— question relevant**

In a prosecution for first degree murder where defendant claimed that he confessed to a murder which he did not commit simply because he did not want to spend the rest of his life in the allegedly intolerable conditions of another state's prison unit, the prosecutor's question regarding defendant's eligibility for parole within two years was relevant to the issue of defendant's motives for confessing that crime.

Justice BRITT took no part in the consideration or decision of this case.

APPEAL by defendant from *Seay, J.,* at the 10 April 1978 Session of CABARRUS Superior Court.

Defendant was tried and convicted for the first degree murder of Clyde Goodnight and for armed robbery. Judgment was arrested on the armed robbery charge, and from a sentence of life imprisonment on the murder charge defendant appealed.

On 7 May 1970 Clyde Goodnight, seventy-two years old, was murdered in his home in the Odell Community in Cabarrus County. His body was found by his niece when she returned to the house from her place of employment about 6:00 p.m. on that date. The deceased's hands and feet were taped and he had been shot once behind the left ear. The house was generally in a state of disarray. A gold watch belonging to deceased and an undisclosed amount of money were missing.

Defendant is a forty-one-year-old inmate in the South Carolina prison system, serving a sentence of life imprisonment plus twelve years for murder and armed robbery in South Carolina. He has been in the South Carolina prison from June 1970 until the present. (After this trial in Cabarrus County defendant was returned to South Carolina where he remains in prison.) In October 1976 defendant and one Danny R. Harrison, another inmate in the South Carolina prison, wrote a letter to the North Carolina State Bureau of Investigation in Raleigh, purportedly confessing to a murder committed in North Carolina "in or about" April 1970. The letter gave several details of the crime. Some were correct statements as to the physical evidence found at the scene of the murder, while other statements set out in the letter were not correct. The writers expressed that their purpose was to get out of the Maximum Security Center in Columbia, South Carolina, and to stand trial in North Carolina so that they

might stay in North Carolina. Upon investigation by the S.B.I. it was found that Harrison was in custody in Florence, South Carolina, on 7 May 1970 and could not have participated in the Goodnight murder.

On 1 November 1976 State Bureau of Investigation Agent Jack Richardson talked with the defendant. At that time defendant described the scene of the Goodnight murder and again admitted committing the crime. He stated that he and Harrison left Greenville, South Carolina, and were traveling north on I-85 looking for a business to rob. They turned off I-85 and saw a two-story white frame house with a circular drive in front. At that time they were driving a Ford truck which belonged to one Bobby Scott. (Bobby Scott's fingerprint was later found on a metal box in the Goodnight residence.) They stopped in front of the house about noon on that day and went to the front door. A gray-haired man about sixty years old met them at the door. They forced their way in and taped the man's hands, but defendant could not remember if they taped his legs. They then took $150 to $200 from the victim's pocketbook. Defendant then started searching the house. He went through all the drawers looking for money, and found an old gold watch which he took but later threw away. Defendant said that he put a set of golf clubs, which he intended to take, at the head of the stairs, but that he later decided to leave the clubs there. (These golf clubs were found at the head of the stairs after the murder.) Defendant further admitted that as they were leaving the house he leaned down and shot deceased in the left temple with a .22-caliber pistol. After his confession, defendant later told Agent Richardson that the statements he had given on 1 November were correct, except for the statement that Danny Harrison was with him.

Defendant testified in his own behalf and denied committing the crimes for which he was charged. He testified that he and Danny Harrison had written the letter stating that they had committed the murder, but that they did so in order that they might escape when brought to North Carolina for trial. If they were unable to escape, they wanted to plead guilty and build time in North Carolina rather than stay in the Maximum Security Center in South Carolina. Defendant further testified that he obtained the details of the murder and robbery of Mr. Goodnight from various inmates in the prison. He stated that he was serving time

in South Carolina for a robbery and murder which he in fact com-
mitted. Of these prior crimes, defendant said: "I shot and killed a
lady, robbing her. I killed her with a .38 pistol. I shot her in the
head. . . . She was very old."

Defendant also introduced the depositions of Roger Hawkins
and Danny Harrison. These witnesses corroborated defendant by
testifying that the letter to the North Carolina authorities was
written for the purpose of coming to North Carolina for an oppor-
tunity to escape, and that defendant had learned the details of the
robbery and murder from various prison inmates.

Further evidence pertinent to decision will be set out in the
opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney
General Donald W. Stephens for the State.*

*Hartsell, Hartsell & Mills by W. Erwin Spainhour for defend-
ant appellant.*

MOORE, Justice.

[1] Defendant first insists that the trial court erred in denying
his motion to dismiss the indictment, pursuant to G.S. 15A-606, on
the ground that no probable cause hearing was held prior to in-
dictment. This same contention was made in *State v. Lester,* 294
N.C. 220, 240 S.E. 2d 391 (1978), and was answered contrary to
defendant's position in this case. There, the Court quoted with ap-
proval from the Official Commentary to G.S. 15A-611, as follows:

"In view of the preexisting jurisdictional law and the
fairly clear legislative intent . . . it seems certain that no
probable-cause hearing may be held in district court once the
superior court has gained jurisdiction through the return of a
true bill of indictment."

The Court then continued:

"We find the logic of this Comment persuasive and
therefore hold that G.S. 15A-606(a) requires a probable cause
hearing only in those situations in which no indictment has
been returned by a grand jury."

In present case indictments were returned on 3 January
1977. At that time defendant was serving time in South Carolina

for another murder committed in that state. No probable cause hearing was necessary. This assignment is overruled.

Next, defendant contends that the trial court erred in denying defendant's motion to quash the indictments on the grounds that the jury commission selected prospective grand jury members in a method contrary to law, and in failing to make findings of fact and conclusions of law in denying said motion.

Since 1 October 1967, each county in North Carolina has had a jury commission of three members. G.S. 9-1. G.S. 9-2 specifies the manner in which the jury commission is to prepare a list of prospective jurors. Defendant does not contend that the jury commission did not follow a systematic selection procedure in drawing up a tentative jury list, in violation of G.S. 9-2. Instead, he contends that G.S. 9-3 was not followed in the selection of names for a tentative jury list.

G.S. 9-3 describes those persons entitled to serve as jurors as follows:

"All persons are qualified to serve as jurors and to be included on the jury list who are citizens of the State and residents of the county, who have not served as jurors during the preceding two years, who are 18 years of age or over, who are physically and mentally competent, who have not been convicted of a felony or pleaded guilty or nolo contendere to an indictment charging a felony (or if convicted of a felony or having pleaded guilty or nolo contendere to an indictment charging a felony have had their citizenship restored pursuant to law), and who have not been adjudged non compos mentis. Persons not qualified under this section are subject to challenge for cause."

G.S. 15A-622(a) provides that the mode of selecting and empaneling grand jurors is governed by Chapter 15A, Article 31, and by Chapter 9 of the General Statutes. G.S. 15A-1211 requires a trial judge to decide all challenges to the panel and all questions concerning the competency of the jurors. G.S. 15A-1211 also provides that a challenge to the panel may be made only on the ground that the jurors were not selected or drawn according to law.

Defendant insists that persons who were qualified under G.S. 9-3 were unlawfully excluded by the jury commission. In order to reach a determination of this issue we must look to the evidence

elicited at the hearing on defendant's motion to quash. John Robinson, Chairman of the Jury Commission of Cabarrus County, testified that in November 1975 the jury commission drew up a tentative jury list by extracting every tenth name from tax listing books and every seventh name from voter registration lists. He said that, from this resulting list of several thousand names, the jury commission checked each name with death certificates from the register of deeds and removed names of deceased persons from the lists. He also testified that the commission consulted various people to determine those persons on the raw list who no longer resided in the county; the post office was frequently consulted in this matter. Mr. Robinson then testified that the sheriff of Cabarrus County had assisted him on occasion in making a determination of those persons on the list who were disqualified under G.S. 9-3 from jury service by virtue of their felonies or pleas of *nolo contendere.* The sheriff would also help him determine those persons who were physically or mentally incompetent, based on his knowledge of persons he had transported to Dix Hospital. The chairman further testified that two deputy sheriffs who acted as the chiefs of police of Concord and Kannapolis had also helped him in this matter at times in the past. These men would go through the cards selected by the systematic procedure and would put a red check by the name of those persons they felt disqualified. The chairman said that he was present when such names were checked, and that in most instances he would inquire why the names had been checked. Regarding those checked for reasons of having committed a felony, the commissioner said that he did not make further inquiry to see if such persons had in fact been convicted of a felony. He further testified that, regarding those names that had been checked, he often assumed, without inquiry, that such persons should be disqualified.

Defendant then introduced a document sent by the jury commission to the register of deeds, stating that the jury commission and the Cabarrus County Sheriff's Department had "checked the raw lists to remove persons deceased, or known to be disqualified under the statutes, and deemed to be *undesirable.*" (Emphasis added.) On cross-examination by the State, the chairman testified that, by "undesirable," he meant those who were mentally incompetent, guilty of felonies, or "persons who were incompetent

for a number of reasons." He said that the sheriff never told him that he had checked a name because he did not like the person.

The sheriff of Cabarrus County testified that he was not sure whether he assisted Mr. Robinson in November 1975, but that he had done so in the past. He said that he had never checked off a name for any other reason except where he knew that a person was a felon, someone he had taken to the State hospital, someone who had moved out of the county, or one whom he knew to be too old or crippled to serve. He testified that the sheriff's department was merely recommending to the jury commission persons they thought unfit, and that the final decision always rested with the commission. The chiefs of police of Concord and Kannapolis, both deputy sheriffs, testified that they did not participate in the compilation of the jury list in November 1975.

[2] After the conclusion of the hearing defendant moved to quash the indictment on grounds that the grand jury which indicted him was improperly constituted due to improper procedures used in November 1975 in drawing up the final jury list from which members of the grand jury were selected. The trial judge denied his motion without making findings of fact. Defendant now argues that the trial court erred in denying his motion, that he put on sufficient evidence to show that G.S. 9-3 had been violated in that persons qualified to serve as jurors had been excluded, and that, due to a violation of G.S. 9-3, he is entitled to have his conviction reversed and the indictment against him dismissed.

Defendant's argument is without merit. To begin with, defendant has not presented evidence which would tend to make out a *prima facie* case for his claim that qualified jurors were unlawfully excluded from the list. *Cf. State v. Hardy*, 293 N.C. 105, 235 S.E. 2d 828 (1977). Though testimony by the chairman of the jury commission would indicate that, in certain instances, the commission did not make proper inquiry before disqualifying certain individuals, but instead simply took the sheriff on his word that such persons were disqualified, there is no evidence which would indicate that persons qualified to serve under G.S. 9-3 were disqualified from the list. *See State v. Yoes* and *Hale v. State*, 271 N.C. 616, 157 S.E. 2d 386 (1967). Furthermore, there is absolutely no evidence here that the sheriff was unlawfully delegated the responsibility, and given the final say, of determining the jury

State v. Vaughn

list. All the evidence shows that the sheriff was called in simply to assist the commission with his recommendations regarding those persons he thought disqualified for service. Such procedure would be entirely proper under the statutes. The fact that the commission may have, improperly, failed to inquire of the sheriff the reasons for his recommendations of disqualification does not, by itself, merit a dismissal of this indictment.

Furthermore, even if there had been a showing that certain qualified persons were improperly disqualified, this would not require a dismissal of the indictment absent a showing of corrupt intent or systematic discrimination in the compilation of the list, or a showing of the presence upon the grand jury itself of a member not qualified to serve. *State v. Yoes, et al., supra; State v. Perry,* 122 N.C. 1018, 29 S.E. 384 (1898); *State v. Haywood,* 73 N.C. 437 (1875); *cf. State v. Hardy, supra.* This Court has held on numerous occasions that, in the absence of statutory language indicating that preparation of jury lists shall be void if the directions of the act be not strictly observed, a mere showing of a violation of the statutory procedures will not merit the quashing of an indictment. *See State v. Yoes, et al.,* and cases cited therein. The fact that these cases were decided prior to the various 1967 amendments to Chapter 9, Article 1, does not vitiate the force of this prior law, for absent from such amendments is the language requiring dismissal unless strict observance is shown. Therefore, we hold that in order to justify a dismissal of an indictment on grounds that statutory procedures were violated in the compilation of the jury list, a party must show either corrupt intent, *State v. Yoes, et al., supra,* discrimination, *State v. Hardy, supra,* or irregularities which affect the actions of the jurors actually drawn and summoned, *State v. Wilcox,* 104 N.C. 847, 10 S.E. 453 (1889). In present case the defendant has offered no evidence tending to show that the allegedly improper statutory procedures prejudiced him in any manner. This assignment is therefore without merit.

Defendant further contends, however, that the trial judge erred in failing to make findings of fact and conclusions of law in denying his motion to quash. In the absence of evidence that any qualified person was excluded from jury service, and in the absence of contradictory and conflicting evidence as to the material facts, the judge is not required to make findings. As

stated in *State v. Hardy, supra.*, "[T]he judge is only required to make findings when the evidence is contradictory and conflicting as to material facts. . . ." There is no conflict of evidence as to material facts in the present case. The testimony indicates that the statutory procedure for the selection of jurors prescribed in Chapter 9 of the General Statutes was followed. This assignment is therefore overruled.

Under his third and fourth assignments defendant argues that the trial court erred in denying defendant's motion to dismiss the indictment pursuant to G.S. 15A-761, Article V(c) of Article 38, the Interstate Agreement on Detainers.

Prior to his extradition to this State, the defendant was serving a life sentence in the State of South Carolina for murder and armed robbery. On 3 January 1977 a grand jury in Cabarrus County returned indictments alleging murder and armed robbery against the defendant. On 29 March 1977, while in prison in Columbia, South Carolina, defendant filed a petition for a speedy trial. A detainer had not yet been filed against defendant at the time of this petition. On 21 April 1977, this petition was presented to Judge Rousseau, presiding in the Superior Court for Cabarrus County. Judge Rousseau did not rule on the petition for reason that the court lacked jurisdiction because defendant was not within this State. On 16 May 1977, the district attorney of the Nineteenth Judicial District filed a detainer and a "Request for Temporary Custody" pursuant to G.S. 15A-761. Defendant was not delivered to this State by South Carolina officials until 10 December 1977, and the defendant's trial began on 10 April 1978.

[3] The defendant first argues that the indictment against him should have been dismissed with prejudice pursuant to G.S. 15A-761, Articles III(a) and V(c), because the State failed to bring him to trial within 180 days after his motion for a speedy trial of 29 March 1977. A reading of defendant's petition for a speedy trial reveals that defendant's petition does not comply with the requirements of G.S. 15A-761, Article III(a). His petition does not contain "written notice of the place of his imprisonment," nor is his request "accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the

prisoner, and any decisions of the State parole agency relating to the prisoner." G.S. 15A-761, Article III(a). Defendant's argument that the prosecutor had knowledge of the place of his imprisonment is irrelevant to the fact that the bare motion for a speedy trial, filed without any of the accompanying information required by G.S. 15A-761, Article III(a), was insufficient to put the prosecutor on notice that the defendant was availing himself of the benefits of the provision and that the prosecutor would be required to put him to trial within 180 days.

As the Court said in *State v. McQueen*, 295 N.C. 96, 244 S.E. 2d 414 (1978), in passing on a similar type claim, "The record before us does not show compliance by the defendant with the procedures so outlined in the above quoted provisions of this Act. . . ." There is nothing in the record which would even indicate that defendant was proceeding under the provisions of the Detainer Act at the time he filed his motion for a speedy trial. A petition for a speedy trial will not be considered as a request for a final disposition under G.S. 15A-761, Article III, unless the prisoner complies with the terms of that provision in order to put the appropriate authorities on notice that he is proceeding thereunder. This assignment is overruled.

[4] Defendant further argues that he is entitled to a dismissal of the indictment with prejudice under G.S. 15A-761, Article V(c) due to the prosecutor's failure to satisfy the requirement of G.S. 15A-761, Article IV(c), which provides that a prisoner delivered to State officials for trial pursuant to a response for temporary custody must be put to trial within 120 days of the arrival of the prisoner in the receiving state. The defendant arrived in Cabarrus County on 10 December 1977, and went to trial on 10 April 1978, 121 days after the defendant was brought into North Carolina. Defendant insists that the statute is to be strictly construed and that he is entitled to have the charges against him dropped with prejudice.

Defendant was initially scheduled for trial on 3 January 1978. Three weeks prior to this date, on 14 December 1977, defendant moved that the court require the attendance of the three material witnesses. When the State of South Carolina refused to deliver the witnesses, defendant, on 26 December 1977, moved for a continuance until the out-of-state witnesses could be present at

trial. Though no order appears in the record granting this motion, it is clear that defendant's motion was allowed, for defendant was not brought to trial on 3 January 1978. On 9 February 1978 the superior court issued a second request for the witnesses. Defendant later moved to depose the witnesses in South Carolina, and on 14 March 1978 this motion was granted. Depositions were taken from the witnesses while they were in prison, and their depositions were introduced into evidence at trial.

In denying defendant's motion to dismiss under G.S. 15A-761, the trial court found that the State had no part in the delay in trial of the defendant, and that such delay was due to defendant's own motions for continuance, made for the purpose of procuring witnesses. Defendant does not contend that the State of North Carolina caused the delay, but claims that said delay was caused by the State of South Carolina in its refusal to allow three witnesses, confined in South Carolina prisons, to come to this State to testify. He asks whether he is required to waive his fundamental right to present witnesses in his defense to avoid waiver of his right to a trial within the period specified in Article IV of the Detainer Act. Article IV(c) of the Act, which provides for the 120-day limit, says "but for good cause shown in open court . . . the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

From the record it is clear that defendant's request for a continuance was allowed, and that the delay in trial was due solely to defendant's inability to obtain these out-of-state witnesses. The delay of 121 days was "for good cause shown," namely, defendant's own motion for continuance due to his inability to obtain witnesses. By requesting this continuance defendant waived his right to be tried within 120 days under this provision. This assignment is overruled.

[5] Under his fifth assignment defendant argues that the trial court erred in denying his motion to dismiss the indictment, said motion being based on the allegation that he was denied his right to a speedy trial under the Sixth and Fourteenth Amendments.

Whether a defendant has been denied the right to a speedy trial is a matter to be determined by the trial judge in light of the circumstances of each case. *State v. Spencer*, 281 N.C. 121, 187 S.E. 2d 779 (1972). The criteria for determining whether such

right has been denied have been set forth by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 33 L.Ed. 2d 101, 92 S.Ct. 2182 (1972). There, the Court said:

> ". . . The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.
>
> "A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

*    *    *

> "We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of a speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." 407 U.S. at 530, 533.

This Court has held on several occasions that persons confined for unrelated crimes are entitled to the benefits of the constitutional right to a speedy trial, just as is any other individual. *See State v. McQueen,* 295 N.C. 96, 244 S.E. 2d 414 (1978); *State v. McKoy,* 294 N.C. 134, 240 S.E. 2d 383 (1978); *State v. Johnson,* 275 N.C. 264, 167 S.E. 2d 274 (1969). In *State v. McKoy, supra,* the Court held that a delay of twenty-two months was excessive where a locally imprisoned defendant had repeatedly requested that he be brought to trial, and the prosecution could offer no reason for ten months of that period other than the fact that the defendant was imprisoned. Though defendant could show but minimal prejudice, the Court held that the prosecution's willful delay in the face of defendant's repeated requests for trial required a dismissal of the charges against him.

More recently, in *State v. McQueen, supra,* the Court held that a delay of almost five years was not excessive where a defendant was imprisoned for a separate murder in another state's prison, when a third state had a separate detainer filed on defendant which had priority over this State's detainer, and where there was no evidence of purposeful delay by State officials and no evidence of loss of witnesses or prejudice to the defendant's standing in the community.

Defendant insists that the delay in his case is like that in *McKoy,* and that he is entitled to release. A review of the facts reveals that his situation is more like that of the *McQueen* case. The crimes in this case were committed in May 1970. Defendant fled the State immediately thereafter, and State officials had no suspects until October 1976 when defendant, serving a life sentence for a separate and intervening murder in South Carolina, wrote S.B.I. officials that he had committed the 1970 murder and robbery. State officials immediately investigated, obtained a separate confession from defendant and an indictment was returned against him a few weeks later on 3 January 1977. At the end of March 1977 defendant filed a motion for a speedy trial. On 16 May 1977 the district attorney of Cabarrus County filed a detainer and request for temporary custody against defendant. On 10 December 1977 South Carolina delivered defendant to the State of North Carolina for trial, and the State was ready to try defendant on 3 January 1978. Defendant, however, on 28 December, moved for a continuance in order to obtain witnesses or their depositions. After said depositions were obtained, defendant was promptly put to trial on 10 April 1978.

The length of the delay between indictment and trial was sixteen months. The delay from December 1977 to the date of trial in April 1978 was due solely to defendant's motion for continuance, based on his inability to obtain witnesses from South Carolina. From January to December 1977 defendant was imprisoned in another state pursuant to a prior conviction in the courts of that state. As the Court said in *State v. McQueen, supra,* ". . . no action which the authorities [of this State] could have taken with reference to the present matter could have terminated that imprisonment." The State did take steps, in May 1977, by their filing of a request for temporary custody, to have defendant delivered to this State for trial. This request was not

honored by the State of South Carolina until December 1977. Soon after defendant moved for a speedy trial in March 1977 the State acted to have him brought to this State for trial. Since he was imprisoned and his confinement would have continued irrespective of any action which Cabarrus County authorities might have taken to bring him to trial, it does not appear that his right to employment or his social standing in the community was adversely affected by the delay. Defendant was not eligible for parole in South Carolina for over three years from the time of indictment; thus, the outstanding indictment could have had no effect on his possible release from prison. Finally, the delay did not cause loss of witnesses favorable to defendant's defense; in fact, trial was delayed over four months so that defendant would have the opportunity to obtain such witnesses.

Defendant has shown no purposeful delay by the State of North Carolina in bringing him to trial. Nor has he shown any prejudice whatever resulting from said delay. The length of the delay is not inordinate, given the fact that defendant was serving a life sentence in another state's prison system. Weighing these factors against the fact that defendant asserted his right to a speedy trial on a single occasion, it appears that defendant's right to a speedy trial has not been violated. This assignment is overruled.

[6] At trial, while counsel for defendant was cross-examining State's witness Richardson, an S.B.I. agent, regarding the place of defendant's imprisonment, the following transpired:

"Q. Describe the Maximum Security Center. What is that? Is that the name of the whole prison or is it something —

A. No, sir.

Q. What is it?

A. It's a place where chronic or incorrigible inmates are kept."

Defendant moved to strike this answer on grounds that it was unresponsive, and the trial judge sustained his objection, instructing the jury to strike the answer from their recollection of the evidence. The defendant now contends that the prejudicial ef-

fect of this answer could not be nullified by the court's instruction, and that he is entitled to a new trial.

We first note that defendant made no motion for a mistrial based on this matter. Secondly, the defendant opened the door for an answer not to his liking. The question is ambiguous, and clearly the answer is responsive to one interpretation of the question. Finally, the defendant, when he took the stand, testified of his own volition to evidence of a similar nature. This assignment is without merit.

[7]  On direct examination of the defendant, his counsel asked him what plea he had entered in a murder trial in South Carolina. The defendant answered "guilty," and the prosecutor objected and entered motion to strike. The trial judge instructed the jury not to consider the answer. Defendant contends that evidence of his former plea was relevant to prove his capacity for truthfulness. A party may not show specific acts of his good conduct or truthfulness as evidence of his good character or capacity for truthfulness. 1 Stansbury, North Carolina Evidence § 111 (Brandis rev. 1973). The trial court did not therefore err in excluding this testimony.

[8]  Defendant finally argues that the prosecutor's question to defendant whether he would be eligible for parole in South Carolina in two years so prejudiced him as to deprive him of a fair trial, even though defendant's objection to the question was sustained. In *State v. Rhodes*, 275 N.C. 584, 169 S.E. 2d 846 (1969), the Court noted that any reference by the judge or prosecuting attorney to the possibility of a parole in the case *sub judice* will constitute prejudicial error. Such testimony, irrelevant to a defendant's guilt, can only encourage a verdict of guilty. *State v. Rhodes, supra.* However, this rule does not apply to circumstances, such as these, where the question concerns parole for a prior crime for which defendant is presently imprisoned, and the defendant himself has, by his own evidence, opened the door to such testimony. Defendant testified that the reason he had confessed to the crimes in this case was not because he had in fact committed the crimes but because he had an insatiable desire to get out of the Maximum Security Center in South Carolina, either by means of a transfer to a prison unit in this State or by means of an escape attempt during the act of transfer. Defendant then

went on to testify regarding the intolerable physical conditions of his place of imprisonment.

Given the rather unusual explanation upon which the defendant based his defense—that he confessed to a murder which he did not commit simply because he did not want to spend the rest of his life in the allegedly intolerable conditions of another state's prison unit—we believe that the prosecutor's question regarding his eligibility for parole within two years was relevant to the issue of defendant's motives for confessing that crime. By attempting to show that defendant was eligible for parole within a short time, the prosecutor clearly hoped to prove the unreasonableness of defendant's testimony that he had confessed to crimes involving one and possiblly two life sentences solely in order to get out of the South Carolina prison. Hence, we believe that in this case the prejudicial effect of the question was outweighed by its relevancy to the defendant's alleged motives for confessing to the crime. Given the additional fact that the trial judge, acting within his discretion, sustained defendant's objection to the question, we cannot perceive how this question could have unduly prejudiced the defendant or improperly influenced the jury verdict. This assignment is overruled.

We have made a careful examination of the entire record and find no prejudicial error.

No error.

Justice BRITT took no part in the consideration or decision of this case.