OPINION OF THE COURT
Ormand N. Gale, J.
Kirk Hughes, the defendant, brought before this court an omnibus motion directed at the indictment herein by which he is charged with rape in the first degree, in violation of subdivision 1 of section 130.35 of the Penal Law; burglary in the first degree, in violation of subdivision 2 of section 140.30 of the Penal Law; and assault in the second degree, in violation of subdivision 6 of section 120.05 of the Penal Law. Specifically, the indictment alleges that the defendant, on or about the night of May 19, 1978, in the City of Syracuse, knowingly entered or remained unlawfully in the apartment of Nancy Simmons, the victim, at 1215 North State Street, intending to commit a crime therein and that the defendant did, in fact, commit the crimes of rape and assault.
The victim was admitted to Crouse Irving Memorial Hospital in the early morning hours of May 20, 1978, after having been found in the hallway outside her apartment by her husband. The hospital chart face sheet indicates an initial diagnosis of facial, neck, and laryngeal trauma and sexual assault. A perusal of the admission notes reveals that Mrs. Simmons, although oriented as to time, place, and person, was unable to remember any details of the events of the preceding hours and consistently responded "I don’t know” to inquiries regarding what had happened. Following emergency room examination, Mrs. Simmons was admitted to the intensive care unit. At 10:00 a.m., a policeman attempted to see Mrs. Simmons but she asked not to be interviewed. At 2:00 p.m. *865 that same day, Mrs. Simmons was transferred from intensive care to the fifth floor and an hour later was questioned by a police detective and visited by her husband. Sometime later that afternoon she was also visited by her parents. The next day, May 21, Mrs. Simmons still could not remember anything about the attack. The nurses’ notes indicate that throughout this period of time Mrs. Simmons was vomiting, dizzy, and sleeping only fitfully. Sometime during the day of May 22 Mrs. Simmons was questioned by a police officer and a social worker was in to see her. The nurses’ notes indicate that following the police interview Mrs. Simmons attempted to remember the details of the assault. She was discharged from the hospital on May 23, 1978.
On May 24, 1978, Investigator George Rendle of the Syracuse Police Department contacted Jay M. Land, a clinical psychologist with 10 years’ experience in hypnosis and hypnotic techniques. Investigator Rendle explained to Dr. Land that a victim in a rape/assault case was having difficulty recalling the events of the attack and Dr. Land agreed to assist in the investigation.
Mrs. Simmons met with Dr. Land on June 7, 1978. She was hypnotized on that date and again on June 29, 1978. During the course of the first hypnotic session, Mrs. Simmons was able to recall details of the events of May 19 and named the defendant, who was known to her, as her assailant. The second hypnotic session resulted in the recall of other details and Mrs. Simmons again identified the defendant. Her recollection of the events of May 19 has continued posthypnotically and she professes a present ability to make an in-court identification of the defendant.
The defendant was a target of the investigation virtually from its inception. On May 20, 1978, at 12:30 p.m., the defendant was invited by Investigator George Rendle to accompany him to the Public Safety Building to discuss the Simmons rape. The defendant agreed to do so and was questioned by Investigator Rendle and Investigator Eugene Leimer.[1]
*866 The defendant was arrested on June 8, 1978.
The defendant, by his omnibus motion, requested extensive pretrial relief. Many of the issues presented in the defendant’s moving papers were resolved at oral argument. The court reserved decision, however, on the defendant’s motion to suppress Mrs. Simmons’ identification testimony and his request for certain items of discovery related thereto.
It is the defendant’s position that because of the two hypnotic sessions, Mrs. Simmons has been rendered incompetent to testify as to those matters elicited under hypnosis. The defendant further contends that, should the court fail to rule that the testimony is inadmissible as a matter of law, it is at the very least essential to hold a pretrial hearing to determine whether the techniques used were so impermissibly suggestive that the testimony must, for that reason, be excluded. The defendant also asserts that the hypnotic sessions were critical stages of the proceedings, requiring the presence of defense counsel, and that the failure to have counsel present deprived the defendant of his Sixth Amendment rights and denied him due process of law.
It is the People’s position that the use of hypnosis as an aid to recall has no effect on the admissibility of the evidence but merely goes to its weight and is, therefore, solely a matter for consideration at trial by the fact finder. They further argue that there has been no "prior identification” in this case within the meaning of CPL 710.30 and 710.20 which could require a hearing because there was no confrontation with the defendant. As a consequence, they have withdrawn their notice of intent to use identification evidence. The People also submit that any question of suggestiveness raised by the defendant is resolved by the affidavit of Dr. Land, attached to their answering papers, in which he expresses the opinion that the procedures used were not biased or suggestive and sets forth the basis for such opinion.
The court is, therefore, called upon to determine (1) whether the victim’s testimony, to the extent that it consists of recollection which was achieved through hypnosis, is inadmissible per se; (2) whether an identification made through hyponosis is a previous identification within the meaning of CPL 710.30 and 710.20 and is, consequently, properly the subject of a suppression hearing to test its propriety; and (3) whether a hypnotic session is a critical stage of the proceedings at which the defendant is entitled to be represented by counsel.
*867 The resolution of these questions requires that the court examine the subject of hypnosis and the case law which has dealt with it.
Hypnosis has been defined as: "an induced state of mind characterized by heightened suggestibility, as a result of which unusual or extraordinary changes in sensory, motor and memory function may be more readily experienced than when the subject is in a normal state. As a further definition suggestibility is the capacity to be affected by influences called suggestions. These suggestions are the means by which the subject’s mental processes or behavior are altered by outside influence such as another person’s or persons’ words. Suggestion may come either when the subject is in an hypnotic or waking (pre-hypnotic or post-hypnotic) state.” (Affidavit of Sheldon Malev, p 2.)
A brief history of hypnosis is instructive. "Hypnotic techniques have been used since antiquity; healing practices by priests of ancient Egypt and Greece are striking examples. Trancelike behaviour attributed to 'spirit possession’ has played a role in Christianity, Judaism, and in many primitive religions. Miraculous powers ascribed to witches and the arts of faith healing throughout the ages are probably related to hypnosis.” (Encyclopedia Brittanica [15th ed], Hypnosis, p 134.) Franze Anton Mesmer (1734-1815), an Austrian physician, is generally credited with the "discovery” of hypnosis in Europe. In 1840, physicians in Calcutta and London made extensive use of mesmeric trance, or hypnosis, in carrying out painless major operations, including leg amputations. It was in that same year that the term "hypnosis” was coined by James Baird, a Scottish physician. Hypnosis attracted widespread interest in the 1880’s but declined somewhat in favor when its use was rejected by Sigmund Freud who turned instead to the technique of free association for treatment of his patients. Relatively little use was made of hypnosis from 1890 until 1940 although it enjoyed popularity during the World Wars I and II in the treatment of combat neuroses. In the 1940’s, in the United States, Milton Erikson pioneered a combined clinical-experimental approach which proved to be an effective research strategy and led to theraputic applications which aroused renewed interest in hypnosis. (See Encyclopedia Brittanica, pp 133-134.)
Hypnosis is now receiving widespread use as a tool in criminal investigations, primarily to aid witnesses in recalling *868 events or details which have apparently been forgotten or unconsciously absorbed. It has enjoyed spectacular successes. For example, in July of 1976, Franklin Edward Ray, a bus driver who, along with the 26 children in his bus vanished outside of Chowchilla, California, was hypnotized and, during the trance, was able to recall five of the six digits on the license plate of the kidnappers’ van. This information proved to be a breakthrough in the investigation.
There is, however, resistance in the scientific community to the use of forensic hypnosis. Much of this resistance centers around the training of police officers as hypnotechnicians. A resolution unanimously accepted on October 19, 1978, by the Executive Council of The Society for Clinical and Experimental Hypnosis includes the following language: "Because we recognize that hypnotically aided recall may produce either accurate memories or at times may facilitate the creation of pseudo memories, or fantasies that are accepted as real by subject and hypnotist alike, we are deeply troubled by the utilization of this techniques [sic] among the police. It must be emphasized that there is no known way of distinguishing with certainty between actual recall and pseudo memories except by independent verification * * * [Pjolice officers usually have strong views as to who is likely to be guilty of a crime and may easily inadvertently bias the hypnotized subject’s memories even without themselves being aware of their actions.”
Other criticism focuses more generally on the question of reliability. Hypnotic age regression is the technique used to take the witness or victim back to the time of the crime. According to Martin T. Orne, M.D., Ph.D., professor of Psychiatry at the University of Pennsylvania, with impressive credentials in the field of hypnosis, this technique has the advantage of increasing recall but also produces a "tendency to confabulate, to fill in those aspects which the individual cannot remember in an effort to comply with the suggestions of the hypnotist.” He further explains, "The details of material that is confabulated depend upon the subject’s total past experience and all relevant cues that [have] been made available to him in the past. Subjects will use cues previously provided in the wake state in an inconsistent and unpredictable fashion; in some instances such cues are incorporated in the confabulated material, while in others the hypnotic recall may be virtually unaffected by them. * * * I have found hypnosis dramatically useful in some instances where I have *869 used it to bring back forgotten memories of witnesses to crimes, while in others a witness might, with the same conviction, produce data that is totally inaccurate * * * As long as this material is subject to independent verification its utility is considerable and the risk attached to the procedure minimal * * * Unfortunately, a witness who is uncertain about his recall of a particular set of events can, with hypnosis, be helped to have absolute subjective conviction about what had happened, though the certainty can as easily relate to a confabulation as to an actual memory * * * The crucial fact is that neither the subject nor the expert observer can distinguish between confabulation and accurate recall in any particular instance. The only way that can be done is on the basis of external corroborative data.” Dr. Orne, however, although recognizing the value of hypnosis as an investigative tool, expresses concern for the subsequent use of the remembered material in court as eyewitness testimony because of the effect the use of hypnosis can have on the subsequent testimony and the irreversible nature of such effect. While not ruling out the use of such testimony, Dr. Orne believes that certain safeguards are essential: (1) Only a psychiatrist or psychologist with special training in the use of hypnosis should carry it out and, to minimize bias and suggestiveness, the hypnotist should be given, in writing, only such facts as are necessary to conduct the session. (2) All contact between the hypnotist and his subject should be videotaped. (3) No one other than the hypnotist and the subject should be present because of the danger that observers will inadvertently communicate to the subject. (4) Prior interrogations should be tape recorded so that it is possible to document thát the witness has not been cued, explicitly or implicitly, about information which is then reported for apparently the first time during hypnosis.
Case law dealing with hypnosis is relatively sparse. In civil cases, courts have held that the use of hypnosis to refresh recollection does not render the resulting testimony inadmissible per se but rather goes to the weight of the evidence: “That [the witness’] present memory depends upon refreshment claimed to have been induced under hypnosis goes to the credibility of her testimony not her competence as a witness.” (Kline v Ford Motor Co., 523 F2d 1067, 1069-1070; see, also, Wyller v Fairchild Hiller Corp., 503 F2d 506; Connolly v Farmer, 484 F2d 456; Austin v Barker, 90 App Div 351, 110 App Div 510.)
*870 The criminal case law has dealt with such issues as assertions that the defendant was acting under the hypnotic influence of another at the time of the commission of the crime (People v Marsh, 170 Cal App 2d 284; Denis v Commonwealth, 144 Va 559); the effect of a claim of hypnosis on withdrawal of a guilty plea (Matter of Tahl, 1 Cal 3d 122; State v Koerner, 32 Wis 2d 60); whether the right to counsel includes hypnotic examination by a psychiatrist (Matter of Ketchel, 68 Cal 2d 397; Cornell v Superior Ct. of San Diego County, 52 Cal 2d 99); whether testimony explaining hypnotic techniques used in a psychiatric examination as a basis for the expert’s opinion regarding the state of mind of the defendant at the time of the crime is admissible (Commonwealth v Langley, 468 Pa 392; People v Modesto, 59 Cal 2d 722; People v Busch, 56 Cal 2d 868); and the admissibility of the defendant’s own statements made during and after hypnosis (Greenfield v Robinson, 413 F Supp 1113 [not a violation of due process to exclude defendant’s statements made while under hypnosis because no reason to suggest they are reliable]; State v Harris, 241 Ore 224 [defendant’s unsworn, extrajudicial, self-serving statements not admissible because hypnosis does not guarantee truthfulness]).
With respect to the specific question of the admissibility of a witness’ testimony following the use of hypnosis to aid recall, criminal courts in several States have followed the civil approach: "The admissibility of [the victim’s] testimony concerning the assault with intent to commit rape causes no difficulty. On the witness stand she recited the facts and stated that she was doing so from her own recollection. The fact that she had told different stories or had achieved her present knowledge after being hypnotized concerns the question of the weight of the evidence which the trier of facts, in this case the jury, must decide.” (Harding v State, 5 Md App 230, 236, cert den 395 US 949; see, also, State v McQueen, 295 NC 96; State v Jorgensen, 8 Ore App l.)[2]
Although it rejected the defendant’s argument that hypnotically induced testimony is inadmissible as a matter of law, the Ninth Circuit Court of Appeals stated: "We are concerned, however, that investigatory use of hypnosis on persons who *871 may later be called upon to testify in court carries a dangerous potential for abuse. Great care must be exercised to insure that statements after hypnosis are the product of the subject’s own recollections, rather than of recall tainted by suggestions received while under hypnosis.” (United States v Adams, 581 F2d 193, 198-199, cert den 439 US 1006.) The court went on to imply that had the defendant’s argument been lack of proper foundation rather than per se inadmissibility, the receipt of the in-court testimony might have been grounds for reversal.
Reversals have, however, been predicated on the prosecution’s failure to disclose the hypnosis or other hypnosis-related prosecutorial misconduct. (Emmett v Ricketts, 397 F Supp 1025; United States v Miller, 411 F2d 825.)
In United States v Narciso (446 F Supp 252, 279) the defendant made a pretrial motion to suppress identification testimony which had been induced by hypnosis. The court conducted a hearing which included testimony by government and defense experts on the issue of whether the circumstances of the case gave rise to a "very substantial likelihood of irreparable misidentification”. (See Simmons v United States, 390 US 377.) After hearing from the experts and viewing the videotapes of the hypnotic sessions, the court concluded that while there was a possibility of misidentification, "that possibility does not measure up to the standard for exclusion set forth by the Supreme Court. Simmons imposes a heavy burden on a party seeking to exclude testimony from trial. The defendants here have failed to meet this burden. On these facts where the probabilities are closely in equipoise, the Court will not remove from the jury the function of finding the facts.” (United States v Narciso, 446 F Supp, at pp 281-282.)
Turning to the issues before it, this court concurs with those courts which have held that testimony, which is hypnotically induced recollection, is not inadmissible as a matter of law. Given a proper foundation of general acceptance in the scientific community and adequate procedural safeguards to insure reliability, this court believes that evidence elicited through hypnosis can be valuable to the determination of the guilt or innocence of those who have been accused of crimes.
The court also believes, however, that where the hypnosis is conducted by or in conjunction with or under the direction of law enforcement personnel, it is clearly an identification proceeding within the meaning of CPL 710.30 and 710.20. To *872 argue that the procedure used herein is not an identification proceeding because it did not involve a confrontation with the defendant is mere semantics and ignores the rationale underlying the rules which have developed with respect to the admissibility of identification evidence. The issue is not whether the defendant has been confronted, but whether there is a need, in order to protect the defendant’s constitutional rights, to test, at the pretrial stage, the propriety of a procedure which gives rise to an identification. Our criminal justice system must remain flexible enough to adjust to new situations and, as the system adjusted to the technique of using photographic arrays for the purpose of identifying suspects, it must now adjust to the use of hypnosis for the same purpose. A "new” police procedure, if it can be subject to the same kinds of abuses, intentional or unwitting, which have given rise to the requirement of a suppression hearing in the past, must now be subject to the same kind of scrutiny. The police initiated use of hypnosis is, therefore, properly the subject of a pretrial hearing to determine whether, under the totality of the circumstances, the procedures used were so impermissibly suggestive as to give rise to the very substantial likelihood of irreparable misidentification. Because the defendant was a suspect at the time, the court expects this inquiry would encompass an exploration of the circumstances of the interrogations of the victim prior to hypnosis and their effect on the process of hypnotic recall, as well as the circumstances of the hypnotic sessions themselves. In this regard, the court directs that copies of the recordings of the hypnotic sessions be made available to defense counsel for examination by his expert witnesses.
The court finds, further, that the hypnotic sessions were not critical stages of the proceedings requiring the presence of counsel to comply with the defendant’s Sixth Amendment rights and the requirements of due process. The determination to be made is "whether the presence of * * * counsel is necessary to preserve the defendant’s basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself.” (United States v Wade, 388 US 218, 227.) In light of the fact that the hypnotic sessions were recorded, and those recordings are presently available for review, the court concludes that the defendant’s rights of *873 cross-examination and effective assistance of counsel have been adequately safeguarded.
It is so Ordered.

. The defendant made inculpatory statements both with respect to the instant case and a previous rape charge (Indictment No. 78-220). During the trial of Indictment No. 78-220, presided over by Honorable Eugene F. Sullivan, Jr., Acting County Court Judge, a Huntley hearing was held out of the presence of the jury. The court ruled that the investigators had failed to advise the defendant of all of his Miranda rights and that such failure rendered the admissions made by the defendant on May 20 involuntary and, therefore, inadmissible. That ruling is, as is conceded by the People, res judicata with respect to this indictment.

. It should be noted that courts have uniformly rejected attempts to have tape recordings of the statements made during hypnotic sessions or other testimony as to those extrajudicial statements admitted. (People v Blair, 89 Cal App 3d 565; State v Jorgensen, 8 Ore App 1, supra; State v Harris, 241 Ore 224, supra.)