Robert A. CHAPMAN, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5505.

Supreme Court of Wyoming.

Jan. 14, 1982.

Ronald P. Jurovich, Thermopolis, for appellant.

Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Criminal Division, and Sharon A. Lyman, Asst. Atty. Gen., Cheyenne, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

ROONEY, Justice.

Appellant-defendant appeals from a judgment and sentence rendered on a jury verdict which found him guilty of burglary in violation of § 6–7–201, W.S.1977. He words the issues on appeal as follows:

1. Did the trial court err in allowing the victim to testify because his memory was refreshed during two hypnotic sessions?

2. Was defendant denied effective assistance of counsel because of the failure to adequately record the hypnotic sessions?

3. Was it reversible error for the prosecution to withhold the testimony of Max Gehring from their case in chief and to present this witness during rebuttal?

We affirm.

The victim (hereinafter referred to as witness) found an intruder in his house when he returned home from work. In the ensuing struggle, the intruder struck the witness on the hand and above the right eye with a hammer. The intruder then fled.

The witness gave a general description of the intruder after the incident. Later, the witness was hypnotized by a Thermopolis city police officer on two occasions. The witness added some details to the previously given description after each session. The reason given for the second session was that the authorities had more than one suspect that matched the description given by the witness during the first session. These sessions were videotaped; however, the tapes, for the most part, were inaudible.

Appellant, on the day of trial prior to any testimony being given, objected to the identification testimony of the witness since it was enhanced by the use of hypnosis. Appellant further asserted that the failure of the videotapes prevented effective assistance of counsel by denying effective cross-examination and by prohibiting appellant's expert to view the procedures used by the State's hypnotist. The court ruled that the State would not mention hypnosis during opening statements and would not present any evidence on hypnosis unless the "defendant opens the gate" on the subject of hypnosis. The State was to be restricted to witness' identification of appellant based on what the "State contends was by reason of the episode that took place where he was assaulted."

In its case in chief, the State presented testimony from the witness and from the investigating officer. The witness testified to the occurrences at the time of the discovery of the intruder, and he identified appellant in court as the burglar. He had previously identified him from a photographic lineup, and the investigating officer so testified.

However, in cross-examination of the witness, the appellant *did* "open the gate" by inquiring at length into the hypnotic sessions, and in its case in chief, appellant called the hypnotist and examined him extensively concerning such sessions. Appellant also presented evidence relative to hypnotism from his own expert witness on hypnotism. Finally, appellant presented four alibi witnesses, including himself.

In rebuttal, the State presented testimony from one who was incarcerated at the time appellant was incarcerated to the effect that appellant had made statements in the form of a confession. Appellant objected to the testimony on the ground that it should have been presented in the State's

case in chief. The objection was overruled. Appellant then presented a surrebuttal witness who testified that he was present at the time the alleged statements in the form of a confession were made and that they were not, in fact, made.

### TESTIMONY BY PREVIOUSLY HYPNOTIZED WITNESS [1]

The issue relative to the admissibility of testimony of witnesses who were previously hypnotized is whether the product of the hypnosis was to refresh or develop the witness' own recollection or to teach the witness and add additional facts to the recollection beyond that which has been mentally stored in the memory, consciously or unconsciously. The issue is properly one for the fact finder—as are all issues relative to the credibility of the witness.

Appellant had ample opportunity to test the credibility of the previously hypnotized witness—to determine whether or not his recollection as to the identity of appellant had been enhanced by the hypnotic sessions and, if so, whether such enhancement was only to the extent of a recall of his own memory or whether it included suggested items which were not a part of his own memory. In all of this, appellant did not elicit any indication that the witness' testimony was other than from his own recollection or that impermissible suggestions were made during the hypnotic sessions which added to that actually within the memory of the witness.

The witness had given a description of the burglar immediately after the burglary. Later, the witness was subjected to the hypnotic sessions. The witness testified that his recollection was refreshed in part thereby. Thereafter, the witness identified appellant as the burglar from a photographic lineup. He subsequently identified appellant in court as the burglar.

The jury had before it the circumstances of the identification, including the part played therein by the hypnotic sessions.

Appellant's attack on the credibility of the witness was before the jury. The success of such attack was for determination by the jury.

The majority of the states are in accord. Such testimony is allowed, leaving it to the fact finder to gauge the credibility of it on the basis of that presented to the fact finder concerning the effect of hypnotism generally and in the specific case. See Annot.: Admissibility of Hypnotic Evidence at Criminal Trial, 92 A.L.R.3d 442, § 8; *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), cert. denied 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969); *United States v. Awkard*, 597 F.2d 667 (9th Cir. 1979), cert. denied 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *United States v. Narciso*, 446 F.Supp. 252 (D.C.Mich.1977); *Clark v. State*, Fla.App., 379 So.2d 372 (1979); *Creamer v. State*, 232 Ga. 136, 205 S.E.2d 240 (1974); *People v. Smrekar*, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979); *People v. Hughes*, 99 Misc.2d 863, 417 N.Y. S.2d 643 (1979); *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978); *State v. Jorgensen*, 8 Or.App. 1, 492 P.2d 312 (1971).

A few states have rejected testimony of a previously hypnotized witness as incompetent. They held such testimony as inadmissible per se in a criminal trial. *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981); *State v. Mack*, Minn., 292 N.W.2d 764 (1980); *Commonwealth v. Nazarovitch*, —— Pa. ——, 436 A.2d 170 (1981). Although there may be considerable merit to such holding, appellant does not request that we go so far. But he does urge us to treat the issue on the basis of competency rather than credibility. He urges us to adopt the following procedural requirements set out in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981) [2] to be met and demonstrated to the court before testimony can be received from a previously hypnotized witness:

---

1. We are not here concerned with the admissibility of statements obtained from an individual while hypnotized, or of testimony given by an individual while hypnotized.

2. The six-point foundation concept was previously advanced by Dr. Martin Orne, a research psychiatrist at the University of Pennsylvania.

1. A psychiatrist or psychologist experienced in the use of hypnosis must conduct the session.
2. The professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.
3. Any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form.
4. Before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.
5. All contacts between the hypnotist and the subject must be recorded.
6. Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview. *State v. Hurd*, supra, 432 A.2d at 96–97.

The party proffering the testimony[3] of a previously hypnotized witness may well be advised to fortify the credibility of such witness by complying with some or all of these safeguards, but there are too many variables in hypnotism to mandate such requirements.

Since suggestion is a keystone to hypnosis, a form of hypnosis or attempts at hypnosis, are common in our daily lives. Advertising agencies depend upon it for their existence. Repeated suggestions of pleasant results from use of a product or service anticipates an acceptance of such and a desire to use it. Subliminal advertising messages on television[4] were recognized as productive, but their use was restricted.

Driving on an open road, watching the monotonous white line, listening to soothing music or to the hum of the motor can produce a form of hypnosis. Self-hypnosis is taught by psychiatrists to assist in eliminating emotional trouble, in overcoming bad habits, for relaxation, etc. Removing oneself from the real world by daydreaming is a form of hypnosis. It has been taught to some of the members of the Air Force to assist in coping with post-crash survival problems.

Conditions for bringing about a hypnotic state include concentration of attention, monotony, inhibition of stimuli, limitation of field of consciousness and limitation of voluntary movement. Under such conditions, one can induce a hypnotic state in others. An induced hypnotic state results from the hypnotist obtaining the attention of the subject and presenting to him a series of suggestive instructions to be accepted in progression from that probable to the subject to that which is improbable to him. This is usually accomplished by oral presentation of the suggestions, but it can be accomplished by physical contact, or by use of mechanical devices such as swinging pendulums, flashing mirrors, rotating disks, metronome, etc. Often the techniques are combined.

There are both quantitative and qualitative differences between subjects in the degree of their involvement in hypnosis. Some people are readily hypnotized. Some can be hypnotized, if at all, only with great difficulty. Furthermore, the hypnotic state is one of degree. Various experts have analyzed the degrees or states to be from 3 or 4 in number to 15 or 20. The degree of involvement varies from a state of drowsiness to a stage of deep somnambulism. Normally, involvement proceeds from slight to large. The involvement of some individuals is limited to the lesser degrees. There is always a potential for "role playing" or

---

3. The defendant in a criminal case is often the party offering such testimony. See "Hypnosis as a Defense Tactic," 1 Toledo L.Rev. 691 (1969); *Cornell v. Superior Court, County of San Diego*, 52 Cal.2d 99, 338 P.2d 447, 72 A.L. R.2d 1116 (1959).

4. Those placed on and taken off the screen so rapidly that they function only beyond conscious awareness.

simulation in which the subject seems to accept the improbable instruction, but in fact does not. It is often difficult to detect "role playing." [5]

▮ An allowance is not made for these variables in the six-point foundation requirement. It attempts to establish a rigid and strict procedural standard to a process characterized by variables in its scope and in its application. The frailties of memory without having been subject to hypnosis could as well be said to require the suggested six-point procedural safeguards as does the memory of a previously hypnotized individual. The emphasis should be placed on credibility and not on competence.

"The common law rules of incompetency have been undergoing a process of piecemeal revision by statutes for over a century, so that today most of the former grounds for excluding a witness altogether have been converted into mere grounds of impeaching his credibility." McCormick on Evidence (2d Ed.), § 61, p. 139. "Competence refers to the condition of the witness at the time he or she is called to testify. * * * That her present memory depends upon refreshment claimed to have been induced under hypnosis goes to the credibility of her testimony not to her competence as a witness. Although the device by which recollection was refreshed is unusual, in legal effect her situation is not different from that of a witness who claims that his recollection of an event that he could not earlier remember was revived when he thereafter read a particular document. * * * " Kline v. Ford Motor Co., Inc., 523 F.2d 1067, 1069–1070 (9th Cir. 1975).

"We cannot accept Fairchild's argument that Wyller's testimony was rendered inherently untrustworthy by his having undergone hypnosis. Wyller testified from his present recollection, refreshed by the treatments. His credibility and the weight to be given such testimony were for the jury to determine. Fairchild was entitled to, and did, challenge the reliability of both the remembered facts and the hypnosis procedure itself by extensive and thorough cross-examination of Wyller and the hypnotist. Under the circumstances, we perceive no abuse of discretion by the district court. See Harding v. State, 5 Md.App. 230, 246 A.2d 302, 311–312 (1968), cert. denied 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969); State v. Jorgensen, 8 Or.App. 1, 492 P.2d 312, 315–316 (Or.App.1971)." Wyller v. Fairchild Hiller Corporation, 503 F.2d 506, 509–510 (9th Cir. 1974).

Our rules are in accord.

"Every person is competent to be a witness except as otherwise provided in these rules." Rule 601, W.R.E.

The rules do not otherwise provide that the testimony of a previously hypnotized witness is incompetent.

"The credibility of a witness may be attacked by any party, including the party calling him." Rule 607, W.R.E.

An attack on credibility is the proper method to determine the value of the testimony of a previously hypnotized witness. Any one or all of the six points may, or may not, have bearing on the credibility of such witness in a given use.[6] But to make the six

5. See the following with reference to the content of the three preceding paragraphs:

Weitzenhoffer, *General Techniques of Hypnotism*, Grune & Stratton, 1957. Dr. Weitzenhoffer was Professor of Psychiatry and Behavioral Sciences, University of Oklahoma Health Sciences Center at the time of publication.

Bryan, *Legal Aspects of Hypnosis*, Charles C. Thomas, 1962. Dr. Bryan was Fellow, Past President, and Executive Director of American Institute of Hypnosis, Los Angeles, California, at the time of publication.

LaCron, *Self-Hypnotism*, Prentice-Hall, Inc., 1964. Mr. LaCron was a Clinical Psychologist at the time of publication.

Gordon, *Handbook of Clinical and Experimental Hypnosis*, The MacMillan Company, 1967. Mr. Gordon was Associate Professor of Psychology and Social Work, University of Michigan, at the time of publication. The book is a collection of papers on clinical and experimental work of a number of authors.

6. A careful attorney, investigator, etc., must always weigh the advantages and disadvantages of an attempt to stimulate the recall of a witness through hypnosis—or even through

points a foundation requirement to the competency of the witness is improper and unworkable.

The trial court did not err in receiving the testimony of the witness in this case.

## DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL

■ Appellant contends that denial of effective assistance of counsel resulted from the failure to make available to him an audible videotape of the hypnotic sessions. Appellant's contention is rejected by our holding that, although, a recording of such sessions would assist in establishing the credibility of the testimony of the witness, it is not a foundation requirement for such testimony.

■ However, we note that the two witnesses to the sessions took notes on them. The record does not reflect any effort by appellant to obtain or use such notes. The notes may have been sufficient for the purpose of a recording requirement. The two witnesses to the hypnotic sessions were subject to interview by appellant, and he could present their testimony. The hypnotist was examined extensively by appellant. He denied any improper factual implantation in the mind of the witness. He explained and exemplified the questions posed by him to the witness during the sessions to substantiate the method by which the memory of the witness was refreshed but not added to with suggestions.

Appellant had adequate means to determine that which transpired at the sessions. Effective assistance of counsel was not impaired.

## REBUTTAL TESTIMONY

■ Section 7–11–201, W.S.1977, provides in pertinent part:

suggestive questions not involved in deliberate hypnotic induction. The use of such may result in a piece of vital information, but the information may become valueless as evidence when the manner in which it is obtained is made known to the jury. Not only may that piece of information become valueless, but the rest of the testimony from that witness may lose credibility. The careful attorney, investigator, etc., will consider use of the safeguards

"(a) After the jury has been impaneled and sworn, the trial shall proceed in the following order:

\*    \*    \*    \*    \*    \*

"(iii) The state must first produce its evidence; the defendant will then produce his evidence;

"(iv) The state will then be confined to rebutting evidence unless the court, for good reasons, in furtherance of justice, shall permit it to offer evidence in chief."

The reception of evidence beyond that which is strictly "rebuttal" is thus placed in the sound discretion of the trial court. Such is in accord with the general law.

"The general rules for the introduction of testimony must be so often applied or relaxed, according to circumstances apparent only to the trial court, that a strict uniformity at all times is not to be expected, and in some instances would prove unjust. Whether there shall be a departure from the usual order of proof is a matter addressed to the sound discretion of the trial court, and an appellate court will interfere only where there is an abuse of discretion. For example, the allowance of evidence to be introduced in rebuttal, which should have been offered in chief, will not be inquired into unless a clear abuse of discretion appears. It has even been said that the reception of evidence out of order is not subject to revision or exception. And failure to follow the regular order of proof has generally been held not to be reversible error unless it is prejudicial." 75 Am.Jur.2d Trial, § 146, pp. 238–239.

"As a general rule, the party upon whom the affirmative of an issue devolves is

such as contained in the six points to protect the credibility of the witness. The investigator in this case made an effort to videotape the sessions. Although the audio portions of the videotapes were defective, his efforts were commendable. However, the impartiality of a hypnotist could be more convincingly established if he were other than a police-related investigator.

bound to give all his evidence in support of the issue in the first instance, and will not be permitted to hold back part of his evidence confirmatory of his case and then offer it on rebuttal. Rebuttal testimony offered by the plaintiff should rebut the testimony brought out by the defendant and should consist of nothing which could have been offered in chief. And unless the court in its discretion dispenses with the requirement, the defendant, as well as the plaintiff, should introduce all his evidence in chief in support of his main case. But the trial court may, in its discretion, permit the introduction of such evidence on rebuttal, and an appellate court will not interfere except in cases of clear abuse of discretion. Nor, as a general rule, will the court on appeal interfere with the discretion of the trial court in refusing to permit evidence in chief to be introduced in rebuttal. However, where evidence is real rebuttal evidence, the fact that it could have been offered in chief does not preclude its admission in rebuttal. And where a failure of proof is not taken advantage of, the court may permit the defect to be supplied on rebuttal." 75 Am.Jur.2d Trial, § 151, pp. 241–242.

The evidence here in question (testimony by one incarcerated with appellant concerning statements made by appellant in the form of a confession) may have been admissible in the State's case in chief. The trial court commented on it in terms of impeaching evidence, but it was actually accepted as part of the State's case in chief.[7] This is evidenced by the fact that appellant was allowed surrebuttal. Rule 7–11–201(a)(iv), supra, makes such within the discretion of the trial court.

The issue here, then, is whether or not the trial court abused its discretion.

"A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there

has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. * * * " *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980).

Before making its ruling in this instance, the trial court ascertained that the identity of the witness and the nature of his testimony had been made known to appellant about one week prior to trial. The trial court advised appellant that he could have surrebuttal. The appellant had his surrebuttal witness available to contest the evidence to be given by the rebuttal witness. The surrebuttal testimony was received.

"Late in the trial, after the defense had rested, the state was permitted to introduce evidence that was properly a part of its case in chief. This was a matter within the discretion of the trial judge, and we think the discretion was not abused. Wyo.C.S.1920, § 7532, par. 4; *Keffer v. State*, 12 Wyo. 49, 73 P. 556; *State v. Pinkston* (Wyo.) 240 P. 219. There is nothing in the record to show that defendant was denied the right to meet this evidence by reopening his case, or that he was not then as well prepared to meet it as he would have been if it had been introduced in its regular order." *Strand v. State*, 36 Wyo. 78, 252 P. 1030, 1032 (1927). See *Janski v. State*, Wyo., 538 P.2d 271 (1975).

Wyo.C.S.1920, § 7532, par. 4, referred to in the quotation is identical with § 7–11–201(a)(iv), W.S.1977, supra.

Under the circumstances of this case, it cannot be said that the trial court acted in a manner which exceeded the bounds of reason. An abuse of discretion did not occur.

Affirmed.

BROWN, Justice, dissenting, with whom ROSE, Chief Justice, joins.

I disagree with the majority's disposition of this case. Stripped of its veneer, this

---

7. A judgment will be affirmed if sustainable on any basis or legal ground appearing in the record. *Wightman v. American National Bank*

*of Riverton*, Wyo., 610 P.2d 1001 (1980); and *Heyl v. Heyl*, Wyo., 518 P.2d 28 (1974).

case holds that a police officer who occasionally plays around with hypnotism can manipulate the recall of a witness and receive the blessing of this court.

The admission in evidence of hypnotically enhanced testimony developed by experts is suspect, even under correct scientific procedures. The admission of hypnotically enhanced testimony, developed by a rank amateur absent any scientific procedure is totally unreliable.

The majority has totally failed to recognize, or even consider, the potential for abuse and the unreliability of hypnotically enhanced testimony.

A few facts need be added to those delineated by the majority. The so-called hypnotist in this case was a police officer. He testified that he had been interested in hypnosis "for quite some time." He was "exposed to it in more depth * * * about January of '80," at the Arson Investigation Seminar, "and subsequent training classes for arson." Sometime in August or September of 1980, the hypnotist took training from Dave Harrington of the State Fire Marshal's Office and from J. P. Johnston, a Cheyenne attorney, one of whom certified him as a hypnotist. We don't know what authority Harrington or Johnston had to certify anyone, nor do we know if this certification was recognized by anyone or any entity. For all we know this certification could have been written on the back of an envelope extracated from the wastepaper basket. Certification must not have been a memorable event in the life of the hypnotist, as he was not even sure who did it.

The hypnotist estimated that he had hypnotized "in the vicinity of two dozen" subjects for practice before hypnotizing Logan. The first person he hypnotized in the course of a criminal investigation was Logan, and he did so approximately one month after receiving his training. The hypnotist has no degree in psychology, nor has he had any college or university courses in psychology or psychiatry. The only training in psychology that he claims to have had was obtained in various classes in police and arson training.

One of the video tapes made at the hypnotic session was totally inaudible. It was testified that 60 percent of the other two tapes could be heard "if you listened very closely". The hypnotist thought notes were taken at the session because he always liked to have two witnesses present taking notes at his sessions. The upshot of all this was that no one at trial ever saw any notes and the video tapes were of no use whatsoever.

The writer of this dissent knows the hypnotist personally. He is a well-qualified law enforcement officer and his honesty and integrity are not in question, but his skills as a hypnotist, and the reliability of the procedures used here, are totally deficient.

I

Webster's dictionary defines hypnosis as "a state that resembles normal sleep but differs in being induced by the suggestions and operations of the hypnotizer with whom the hypnotized subject remains in rapport and responsive to his suggestions * * *."[1] There are many descriptions of hypnosis and hypnotism, but all include the idea that the subject of hypnosis is highly susceptible to suggestion.[2]

Man has known of the phenomenon of hypnosis for many years. It was practiced in ancient times and primitive societies. In

---

1. Webster's Third New International Dictionary, Unabridged, p. 1114, (G. & C. Merriam Co., Publishers, 1966).

2. Hypnosis:
   "1. Hypnotic state: an artifically induced state resembling deep sleep, or a trancelike state in which the subject is highly susceptible to suggestion and responds readily to the commands of the hypnotist. 2. Somnus: natural sleep (rare)." Stedman's Medical Dictionary, Third Unabridged, Lawyer's Edition, p. 606 (1972).
   Hypnotism:
   "The act of inducing artificially a state of sleep or trance in a subject by means of verbal suggestion by the hypnotist or by the subject's concentration upon some object. It is generally characterized by extreme responsiveness to suggestions from the hypnotist." Black's Dictionary, p. 668 (5th ed. (1979)).

the past, hypnotism was associated with theatrical exhibitions, carnival fakery and fiction.[3]

The most famous case of a subject of hypnotism who imagined an event under hypnosis is that of "Bridey Murphy," a woman who supposedly was "age regressed" to a prior incarnation under hypnosis.[4] In fact, she had inserted into a memory bank facts which came from an entirely different part of her life. Bridey Murphy led one leading authority on hypnosis to observe that the case "shows that memories revived under hypnosis no matter how convincing to the subject, cannot be trusted until verified by external criteria. The 'will-to-believe' may be so strong in the hypnotist as well as in the subject as to give the impression of validity."[5]

Within the last 35 years hypnotism has taken on a measure of respectability. In the mid-1950's the British and American Medical Associations formally approved hypnotism's medical use, and in recent years a minority of psychiatrists have used hypnosis to treat mental and emotional conditions.[6]

Hypnotism is accepted by some as an investigative tool. It undoubtedly has value when used to enhance memory in investigations.[7] However, investigators must realize that the use of hypnosis for such purposes may render the potential witness incompetent by destroying the probative value of any evidence that might otherwise have been produced.[8]

Granted that hypnosis is a valuable medical therapy tool, and also has a function in investigation, it is an entirely different matter when hypnosis is employed to enhance the recall of a prospective witness. It seems that it is a big jump from therapy and investigation to enhancing memory without better information than the courts have had in the past. Because a person under hypnosis is highly susceptible to suggestion, we must be very cautious in our approval of hypnotically enhanced recall.

In Dr. Bernard L. Diamond's law review article, "Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness," 68 Cal.L.Review 313, he concludes: "Many courts currently admit testimony from previously hypnotized witnesses without an adequate understanding of the nature of hypnosis and its dangers to truly independent recall. Perhaps influenced by often naive legal scholarship and biased expert testimony, these courts apparently believe that cross-examination

---

3. Lewis R. Wolberg, M.D., *Hypnosis: Is It For You?*, Harcourt Brace Jovanovich, Inc., New York, p. 285 (1972):

"* * * Hypnosis is a much misunderstood phenomenon. For centuries it has been affiliated with spiritualism, witchcraft, and various kinds of mumbo jumbo. It is a common tool of quacks, who have used it to 'cure' every imaginable illness, from baldness to cancer. The exaggerated claims made for it by undisciplined persons have turned some doctors against it. Some psychiatrists, too, doubt the value of hypnosis because Freud gave it up sixty years ago and they themselves have not had too much experience with its modern uses."

4. Bernstein. The Search For Bridey Murphy (1956), and Kline, ed., A Scientific Report on the "The Search for Bridey Murphy" (1956).

5. Hilgard. Divided Consciousness: Multiple Controls in Human Thought and Action. New York: Wiley (1977), at p. 59.

6. 12 Encyclopedia Britannica 24 (1964).

7. "For example, in the Chowcilla kidnapping of 26 children who had been riding in a school bus, the bus driver was able to recall under hypnosis a license plate number. This proved instrumental in the apprehension of the kidnappers." 68 Cal.L.Rev. 313, 332, n. 93 (1980).

8. Bernard L. Diamond, M.D., doubts the value of hypnosis as an investigative tool:

"In my opinion, however, the value of hypnosis for investigative purposes has been greatly overstated by exaggerated claims in irresponsible books and articles. As Freud discovered long ago, whatever can be done by hypnosis can also be done without hypnosis; it merely takes longer and requires greater skill and patience. My own experience convinces me that safe and effective enhancement of recall, with less hazard of suggestion and contamination of future testimony, can be accomplished without gimmicks such as hypnosis and 'truth serum.'" 68 Cal.L.Rev. 313, 332, n. 93 (1980).

and expert witness attacks on the credibility of such testimony will reveal any shortcomings in the hypnosis and get to the truth. This hope is misplaced. Even if the hypnotist takes consummate care, the subject may still incorporate into his recollections some fantasies or cues from the hypnotist's manner, or he may be rendered more susceptible to suggestions made before or after the hypnosis. A witness cannot identify his true memories after hypnosis. Nor can any expert separate them out. Worse, previously hypnotized witnesses often develop a certitude about their memories that ordinary witnesses seldom exhibit. Further harm is caused by 'expert' witnesses (often self-styled and police-oriented) who, testifying in the state's behalf, make extravagant, scientifically unjustified claims about the reliability of hypnotically enhanced testimony. The plain fact is that such testimony is not and cannot be reliable. The only sensible approach is to exclude testimony from previously hypnotized witnesses as a matter of law, on the ground that the witness has been rendered incompetent to testify." 68 Cal.L.Rev. 313, 348–349 (1980).

The two major professional associations in the field of hypnosis issued identical resolutions condemning the employment of hypnosis by untrained or minimally trained police officers:

"[This organization] views with alarm the tendency for police officers with minimal training in hypnosis and without a broad professional background in the healing arts employing hypnosis to presumably facilitate recall of witnesses or victims privy to the occurrence of some crime. Because we recognize that hypnotically aided recall may produce either accurate memories or at times may facilitate the creation of pseudo memories, or fantasies that are accepted as real by subject and hypnotist alike, we are deeply troubled by the utilization of this technique among the police. It must be emphasized that

there is no known way of distinguishing with certainty between actual recall and pseudo memories except by independent verification * * *.

"For these and related reasons, [this organization] is strongly opposed to the training of police officers as hypnotechnicians and the use of hypnosis by the police officer. In those instances when hypnosis is appropriately used in law enforcement, trained psychiatrists or psychologists with experience in the forensic use of hypnosis should be employed, care must be taken to control the amount of information wittingly and unwittingly provided to the subject, and all interactions with the subject before, during, and after hypnosis must be videotaped." [9]

## II

The first reported case that I am aware of concerning the use of hypnosis for enhancement of a witness' memory was *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), cert. denied, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969). In that case a psychologist hypnotized the victim of the alleged crime to restore her memory. At trial the testimony of both the victim and the hypnotist was admitted in evidence and eventually upheld by the appellate court. This case spawned other cases cited in the majority opinion.

*Harding* and its progeny generally reason that testimony of a witness whose memory has been enhanced through hypnosis should be treated like other witnesses whose present recollection has been refreshed. Under this rationale it is assumed that skillful cross-examination will enable the jury to evaluate the effect of hypnosis on the witness and the credibility of his testimony. See *State v. McQueen*, 295 N.C. 96, 120–121, 244 S.E.2d 414, 427–428 (1978); *State v. Jorgenson*, 8 Or.App. 1, 9, 492 P.2d 312, 315 (1971).

**9.** Resolution passed in October 1978 by the Society for Clinical and Experimental Hypnosis and in August 1979 by the International Society of Hypnosis, as reported in 27 Int. Jour. Clin & Exp. Hypnosis 452, 453 (1979).

Recent cases have been critical of basic assumptions in *Harding* and its progeny. In *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1980); and *State v. Mack*, Minn., 292 N.W.2d 764 (1980), the courts considered expert testimony and other evidence concerning the problems associated with using hypnosis as a means of reviving memory. The Arizona and Minnesota courts held that because hypnosis is essentially a scientific procedure it must satisfy the standard for the admissibility of scientific evidence established in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); accord, *Polk v. State*, 48 Md.App. 382, 427 A.2d 1041, 1048 (Ct. Spec.App.1981); and *People v. Tait*, 99 Mich.App. 19, 297 N.W.2d 853, 857 (1980).

Applying the *Frye* test, both Arizona and Minnesota courts found that hypnosis has not gained general acceptance in the particular field in which it belongs, at least as a means of obtaining accurate recall of prior events. Therefore, they held that the testimony of a witness who has undergone hypnosis to refresh his recollection is per se inadmissible in a criminal trial.

The Supreme Court of Pennsylvania in *Commonwealth v. Nazarovitch*, Pa., 436 A.2d 170 (1981), held that any means by which evidence is scientifically adduced must satisfy the standard established in *Frye v. United States*, supra, at 172. The Pennsylvania court, however, held that at this time it did not want to establish a per se rule of inadmissibility, holding:

" * * * We will not permit the introduction of hypnotically-refreshed testimony until we are presented with more conclusive proof than has been offered to date of the reliability of hypnotically-retrieved memory * * *." *Commonwealth v. Nazarovitch*, supra, at 178.

I favor the approach of the Pennsylvania court rather than a per se rule that hypnotically enhanced recall is inadmissible, as was done by Arizona and Minnesota.

### III

The standard for admitting scientific testimony most commonly employed by the courts is set out in *Frye v. United States*, supra, at 1014:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

In *Frye*, the court held that the results of a polygraph test were inadmissible because the defense had not established that the device was generally accepted in the scientific community as a reliable indicator of a person's truthfulness.

The underlying rationale for requiring a standard is fear that the trier of fact, usually a jury, will accord uncritical and absolute reliability to a scientific device or phenomenon without considering its shortcomings. Jurors tend to give considerable weight to scientific evidence when presented by experts with impressive credentials. The aura of special reliability and trustworthiness surrounding scientific or expert testimony makes it particularly necessary that a careful foundation be laid for its admission.

Although setting out specific procedural safeguards would not be helpful in a dissent, legal literature suggests some general guidelines that might be helpful to police and prosecutors who want to assure that the hypnotic testimony is reliable and not risk a possible reversal when we eventually decide that our ruling here is an anomaly.

When hypnotically enhanced testimony is offered in evidence the trial judge should determine as a preliminary matter that:

1. Hypnosis, as a means of refreshing or enhancing recall, is generally accepted in the scientific community.

2. The hypnotist is qualified.

3. The use of hypnosis is appropriate for the kind of memory loss encountered in the case before the court.

4. Correct scientific procedures are employed in producing enhanced recall.

This four point preliminary determination is not unlike foundation necessary for the admission of any medical or scientifically related testimony.

The majority has alluded to a six point procedural requirement set out in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981).

One authority, Dr. Martin T. Orne, has suggested guidelines for "correct scientific procedure" in the context of forensic hypnosis: [10]

"1. Hypnosis should be carried out by a psychiatrist or psychologist with special training in its use. He should not be informed about the facts of the case verbally; rather, he should receive a written memorandum outlining whatever facts he is to know, carefully avoiding any other communication which might affect his opinion. Thus, his beliefs and possible bias can be evaluated. It is extremely undesirable for the individual conducting the hypnotic sessions to have any involvement in investigation of the case. Further, he should be an independent professional not responsible to the prosecution or the investigators.

"2. All contact of the psychiatrist or psychologist with the individual to be hypnotized should be videotaped from the moment they meet until the entire interaction is completed. The casual comments which are passed before or after hypnosis are every bit as important to get on tape as the hypnotic session itself. (It is possible to give suggestions prior to the induction of hypnosis which will act as posthypnotic suggestions.) . . .

"3. No one other than the psychiatrist or psychologist and the individual to be hypnotized should be present in the room before and during hypnotic session. This is important because it is all too easy for observers to inadvertently communicate to the subject what they expect, what

they are startled by, or what they are disappointed by . . .

"4. Because the interactions which have preceded the hypnotic session may well have a profound effect on the sessions themselves, tape recordings of prior interrogations are important to document that a witness had not been implicitly or explicitly cued pertaining to certain information which might then be reported for apparently the first time by the witness during hypnosis."

The California Attorneys for Criminal Justice suggest the following guidelines for correct scientific procedure:

"1. That the hypnotist be a mental health person with special training in the use of hypnosis, preferably a psychiatrist or psychologist;

"2. That this person not be informed about the case verbally, but only in writing subject to scrutiny;

"3. That the hypnotist be independent and not responsible to the parties;

"4. That all contact between the hypnotist and the subject be video-taped from the beginning to the end;

"5. That nobody representing either party be present with the hypnotist and the subject during the session;

"6. That prior to the session hypnotist examine the subject to exclude the possibility of physical or mental illness and to establish sufficient intelligence, judgment, and comprehension of what is happening;

"7. That the hypnotist elicit all facts from the subject prior to the hypnosis;

"8. That during the session, hypnotist strive to avoid adding any new elements to subject's description, including any explicit or implicit cues, before, during, or after the session;

"9. That corroboration be sought for any information elicited during the session." [11]

10. Orne, "The Use and Misuse of Hypnosis in Court," pp. 311, 338–339. These guidelines are also cited in *State v. Mack*, Minn., 292 N.W.2d 764, n. 14, p. 771 (1980). Dr. Orne is co-author

of the article on hynosis in 9 Encyclopedia Britannica Macropedia 133 (15th ed. 1979).

11. These guidelines, first set forth in *Wisconsin*

In cases cited by the majority permitting hypnotically enhanced testimony, and in other cases that I have read, the hypnotist had at least a modicum of expertise and employed some verification procedure. Here we have questionable expertise and a total lack of verification. I know of no case that has permitted the admission of hypnotically enhanced testimony with such a total lack of foundation.

In considering qualifications and procedural safeguards here, it is obvious that there was a total lack of compliance with any safeguards or procedures. The hypnotist in the case at bar was not a psychiatrist or a psychologist, but was interested in hypnosis as a hobby. Also, the hypnotist performing the hypnotic session was not independent of the parties involved, but was a police officer. There was also a failure to reduce to writing any information that had been given the hypnotist by the law enforcement people. Further, there is no record that the hypnotist obtained from the subject a description of the facts as the subject remembered them before the hypnosis session. The hypnosis session was not recorded. Apparently there were no back-up procedures; that is, no stenographic notes were taken and no handwritten notes surfaced. Lastly, the session was not conducted with the hypnotist and the subject only; other people including police officers were present during the hypnosis session.

Police and prosecutors should not test the court again but should take immediate measures to insure that the hypnotist is qualified and that the patent deficiencies in the procedures here are not repeated. Poorly conceived law usually survives its maker. Its puny existence is sustained mainly by sentiment. I believe that this court will retreat from its holding here. This case should be placed in a museum as an object of interest, but of no value as a precedent.

The state failed to demonstrate that the use of hypnosis in this case was sufficiently reliable to allow Mr. Logan's testimony to be admitted. I would, therefore, reverse and remand for a new trial.

---

v. *White*, No. J–3665, March 27, 1979, are reprinted in 17th Annual Defending Criminal Cases, "A Practical Look at Current Developments in Criminal Law," Ephraim Margolin, ed., Vol. 2, at 987–988 (Practicing Law Institute, 1979).